**TRUSTCORP MORTGAGE COMPANY, Appellant,**

v.

**METRO MORTGAGE CO., INC., Appellee.**

No. 71 A05–0611–CV–665.

Court of Appeals of Indiana.

May 30, 2007.

Rehearing Denied July 25, 2007.

Dale W. Eikenberry, Jamie A. Young Wooden & McLaughlin, LLP Indianapolis, IN, Attorneys for Appellant.

David L. Mirkin, South Bend, IN, Attorney for Appellee.

## OPINION

FRIEDLANDER, Judge.

Trustcorp Mortgage Company (Trustcorp) appeals the trial court's order denying its motion for summary judgment and granting summary judgment in favor of Metro Mortgage Co., Inc. (Metro).

We affirm.

This case arises out of an action initiated by Trustcorp against Metro to recover damages it incurred as a result of Metro's alleged breach of contract. Trustcorp

1. Metro is a loan brokerage firm located in Madison, Wisconsin.

2. This was the second Buy/Sell agreement between the parties. The first agreement was executed by the parties in 1991, and con-

is a wholesale mortgage lender that underwrites and purchases loans from mortgage brokers, such as Metro.[1] Trustcorp and Metro had a long-standing relationship whereby Metro would originate, process, and close mortgage loans approved and underwritten by Trustcorp. As the underwriter of the loans, Trustcorp would review the loan "package" and either approve the loan for funding or not. *Appendix* at 180–81. Trustcorp would then purchase certain loans from Metro and resell them to secondary market investors, such as the Federal National Mortgage Association (Fannie Mae).

On June 25, 1996, Trustcorp and Metro entered into a Buy/Sell Agreement.[2] Trustcorp's Production Affiliate Policy and Procedure Manual ("Manual") was also incorporated into the Buy/Sell Agreement. Because it is critical to the resolution of this appeal, we reproduce the Buy/Sell Agreement, in relevant part, below:

### BUY/SELL AGREEMENT

This Buy/Sell Agreement ("Agreement") is entered into this 25th day of June, 1996, by and between Trustcorp Mortgage Company, South Bend, Indiana ("Purchaser") and Metro Mortgage ("Seller").

Purchaser wishes to purchase first mortgage real estate loans with servicing rights from Seller and Seller wishes to sell such loans with servicing rights to Purchaser from time to time.

Therefore, Purchaser and Seller, each in consideration of the others' [sic] agreements hereinafter set forth, agree as follows:

tained substantially the same language, except for the "WARRANTIES and REPRESENTATIONS" section. Appendix at 46. The 1996 contract was in effect at the time the facts of this case arose.

1. *AGREEMENT:*

Purchaser shall purchase first mortgage real estate loans with servicing rights ("Loans") from Seller, and Seller shall sell Loans to Purchaser from time to time on all of the terms, conditions and provisions of Purchaser's Production Affiliate Procedures Manual ("Manual"), and the Manual is incorporated herein by this reference.

2. *INSPECTION AND REMEDIES:*

Purchaser shall, during regular business hours, have the right to inspect and make copies from Seller's records concerning Loans that are the subject of this Agreement. In the event of any breach or threatened breach by Seller of any of the provisions of this Agreement, Purchaser shall have all rights and remedies at law and in equity which are available for such breach or threatened breach, including but not limited to, injunctive relief, recovery of damages and specific performance. Seller shall reimburse Purchaser for all of its reasonable costs and expenses, including attorney fees, expended by Purchaser in pursuing its rights and remedies under this Agreement.

3. *WARRANTIES AND REPRESEN-TATIONS:*

Seller warrants, represents and covenants to [P]urchaser its successors and assignees, that the following are true, complete and correct with regard to each loan submitted to Purchaser, as of the date of such submission to Purchaser, and as of the date of purchase of the Loan by Purchaser:

   3.1  The note and mortgage are good, valid and enforceable instruments, free of defect or objection and are supported by all documents required by applicable governmental agencies and/or secondary market investors ("Investor"). There are no defaults in any of the documents evidencing or securing the loan, and there are no events which with notice or the passage of time could constitute such default. The obligation secured by said mortgage is not usurious or in violation of any law which governs the rate or amount of interest which can be charged or paid on the obligation.

\* \* \* \*

   3.5  The loan has been originated, processed and closed by Seller in accordance with prudent lending standards and meets all of Purchaser's requirements, as set forth in Purchaser's Manual or as otherwise communicated to Seller.

   3.6  Seller has made diligent inquiry into all material facts and circumstances in the making of the loan, including all material representations of the mortgagor and as far as the Seller is *aware*, all submitted documents are genuine and valid and contain no material errors and no misstatement of material fact. Seller shall promptly notify Purchaser if it becomes aware of any such errors or misstatements.

\* \* \* \*

4. *REPURCHASE:*

If Seller fails to meet all of the requirements of this Agreement concerning any Loan within the time periods specified therefore, Seller shall repurchase such [L]oan. In addition, if any Loan contains any fraudulent or false documents, Seller shall repurchase the Loan. Seller agrees to pay to Purchaser promptly upon demand such amounts as may be

required by Purchaser to repurchase from Investor any [L]oans required to be removed by Investor because of origination defects, material misstatements of facts, or failure by Seller to fully comply in all respects with guidelines and requirements....

\* \* \* \*

6. *RESPONSIBILITIES AND BENEFITS:*

It is the intention of Seller and Purchaser that Purchaser be entitled to rely on Seller's representations and warranties without regard to any act or omission of Purchaser, and no underwriting, review, processing, closing, auditing, knowledge or other involvement or opportunity by Purchaser with respect to the Loan shall affect in any way either the representations and warranties made by the Seller to Purchaser or the responsibilities and obligations of Seller to Purchaser hereunder. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns.

\* \* \* \*

8. *MANUAL:*

Seller acknowledges the receipt of a full copy of the Manual. The Manual and any revisions or amendments to the Manual are incorporated by reference and made a part of this Agreement. Any revision of or amendments to the Manual shall be effective from the time that Seller receives written copies thereof.

*Appendix* at 46–49 (emphasis added). The Manual, incorporated by reference in the Agreement, contained the following pertinent language:

## CHAPTER 1. PURCHASER/SELLER RELATIONSHIP

### Section 100   General

This manual is to be made a part of the BUY/SELL Agreement executed by PURCHASER. The PURCHASER must make sure that its staff is thoroughly familiar with the content and requirements of this manual, as it now exists and as it may be changed from time to time.

\* \* \* \*

### Section 103   SELLER'S Origination Duties

It shall be the responsibility of the SELLER:

1. To supervise, maintain and operate its business;

2. To comply will all existing and amended Federal, State, and municipal laws, rules, regulations including but not limited to those of the FHA/VA, Federal National Mortgage Association ...;

3. To abide by the policies and procedures established by the PURCHASER for loans originated under this Agreement;

4. To only originate, process, or close those loans under this Agreement which qualify for either FHA/VA, Federal National Mortgage Association ... or other investors for whom PURCHASER either sells or services mortgage loans;

\* \* \* \*

### Section 104   SELLER'S Representations & Warranties

SELLER represents and warrants to PURCHASER that with respect to each and every loan sold to PURCHASER:

\* \* \*

4. That all of SELLER's origination duties (Section 103 above) apply with respect to each loan sold, trans-

ferred and delivered to PURCHAS-ER;

\* \* \*

## Section 105 Indemnification & Hold Harmless

SELLER hereby agrees to indemnify and hold PURCHASER and all subsequent assignees harmless from and against any loss or damage including attorneys fees and costs as may be incurred or damages sustained from any inaccuracy in SELLER's failure to fulfill its origination duties (Section 103), breach of representations and warranties (Section 104), or failure to comply with any other provisions of this Agreement.

## Section 106 Appraiser Review

The SELLER is responsible for determining the acceptability of the appraiser as outlined in agency guidelines. PURCHASER however reserves the right to approve or decline the acceptability of any appraiser or appraisal firm on an ongoing basis. The appraiser may not be an employee or related to an employee of the SELLER without prior written authorization by the PURCHASER. SELLER will obtain copies of approved appraiser's license on an annual basis and forward same to PURCHASER. PURCHASER will not accept appraisals from any appraiser for whom we have not received a current license.

## Section 106.01

Appraiser Application The appraiser must provide the following:

1. Resume
2. Copy of Appraiser's license. . . .

3. Any other documentation that appraiser feels appropriate.

*Id.* at 56–57.

In March of 2002, Metro originated, processed, and closed a loan (in the amount of $127,075.00) for Douglas Schulke that was secured by real property located at 7672 Evergreen Hill Drive, Waupaca, Wisconsin (the Schulke property). Trustcorp approved the loan package submitted by Metro for the Schulke property and subsequently purchased the loan from Metro. To support, in part, the sale of the Shulke Loan to Trustcorp, Metro submitted a Residential Real Estate Appraisal performed by Dwain Johnson (Johnson Appraisal) with a February 25, 2002 effective date. After purchasing the Schulke Loan from Metro, Trustcorp sold the Schulke Loan to Fannie Mae on August 14, 2002.

Approximately two years after Trustcorp sold the Shulke Loan to Fannie Mae, the Schulke Loan went into default and, ultimately, foreclosure. Fannie Mae conducted a post-foreclosure review that revealed certain alleged deficiencies in the Johnson Appraisal. These deficiencies, according to Fannie Mae, made the Schulke Loan ineligible for sale to Fannie Mae. Fannie Mae notified Trustcorp of the ineligibility of the Schulke Loan for sale to Fannie Mae and offered Trustcorp the opportunity to provide additional information to support the appraisal and correct the ineligibility issues. Trustcorp obtained a letter from the appraiser, Johnson, and submitted it to Fannie Mae, but the letter did not correct the deficiencies and Fannie Mae demanded that Trustcorp repurchase the loan pursuant to its contract with Trustcorp.[3]

---

3. We note that Trustcorp did not include in its designated evidence a copy of its contract with Fannie Mae, or a copy of Fannie Mae's guidelines to which Trustcorp refers in its brief.

Trustcorp hired a review appraiser to conduct a review appraisal of the Johnson Appraisal on the Shulke property. The review appraiser determined that the Johnson Appraisal was in fact defective in the ways indicated by Fannie Mae, and that it contained additional defects as well. Based on this review, and Fannie Mae's demand letter, Trustcorp determined that it was contractually obligated to repurchase the Shulke Loan from Fannie Mae because it did not comply with Fannie Mae's guidelines. Trustcorp repurchased the Shulke property on December 16, 2004, for $123,476.41. Prior to repurchasing the Shulke Loan, however, Trustcorp demanded that Metro repurchase the Shulke Loan on December 10, 2004, but Metro refused. Trustcorp subsequently attempted to mitigate its damages in 2005 by selling the Shulke property, and sustaining an out-of-pocket loss of $66,803.35.[4]

Trustcorp filed its complaint for breach of contract on September 9, 2005. On July 28, 2006, Trustcorp and Metro filed crossmotions for summary judgment each supported by the designation of evidence. The trial court conducted a hearing on the parties' motions on September 11, 2006, and on October 19, 2006, the trial court issued an order denying Trustcorp's motion for summary judgment and granting Metro's crossmotion for summary judgment. In so doing, the trial court made the following pertinent findings of fact and conclusions of law:

### FINDINGS OF FACT

The Court finds the following material facts are not in dispute:

* * *

6. Trustcorp's Production Affiliate Policy and Procedure Manual ("Manual"), which is incorporated into the Agreement states that it is the [sic] Metro's duty "to only originate, process, or close those loans under this Agreement which qualify for ... Federal National Mortgage Association." (a/k/a Fannie Mae).

* * * *

7. Also, according to the Manual, although Metro was responsible for determining the acceptability of the appraiser, Trustcorp has the right to approve or decline the acceptability of the appraiser. The only other restriction placed on the acceptability of the appraiser is that the appraiser cannot be an employee or related to an employee of Metro. The appraiser must also submit a copy of his appraiser's license annually.

8. On February 25, 2002, pursuant to Metro's instruction, Dwain L. Johnson ("Appraiser"), a licensed appraiser, estimated the market value of a residence located at 7672 Evergreen Drive, Waupaca, Wisconsin ("Shulke property") at One Hundred Forty–Nine Thousand Five Hundred Dollars ($149,500.00). Appraiser had submitted his appraiser's license and resume to Metro before he was hired.

9. In approximately March 2002, Metro originated, processed and closed a loan to a borrower by the name of Douglas Schulke ("Schulke loan"), for the Schulke property. The Schulke loan was submitted to Trustcorp and approved. The Schulke loan was secured by the Schulke property.

---

4. Trustcorp's computation of damages is disputed by Metro; however, in light of our resolution of this case, we need not determine whether Trustcorp's allegations concerning said damages are supported by the evidence.

10. Pursuant to the Agreement, at closing, the Schulke loan was sold to Trustcorp. Trustcorp, in turn, sold the loan to Fannie Mae.

11. The Schulke property was foreclosed upon on August 25, 2004, by Fannie Mae. Fannie Mae informed Trustcorp of "serious eligibility issues" that constituted material errors or misstatements of fact in the appraisal prepared by [Johnson] and demanded that Trustcorp repurchase the loan.

12. Trustcorp repurchased the Schulke loan from Fannie Mae.

13. Metro was not aware at the time of submission or sale of the Schulke loan to Trustcorp of any eligibility issues, material errors or misstatements of fact relating to the Schulke loan package, including the appraisal prepared by [Johnson].

14. The material errors or misstatements of fact in the [Johnson] appraisal as alleged by Trustcorp are not apparent from the face of the appraisal. The alleged material errors or misstatements of fact were discovered by Fannie Mae only after it had an investigation conducted into the underlying facts of the appraisal. In other words, there are no serious eligibility issues, material errors or misstatements of material fact on the face of the appraisal.

15. Metro had no knowledge of any questions or deficiency claims relating to the appraisal until approximately August of 2004 when Trustcorp demanded Metro repurchase the loan.

16. Where appropriate or necessary, each of the foregoing findings of fact shall be considered a conclusion of law.

## CONCLUSIONS OF LAW

\* \* \* \*

B. Based on the foregoing Findings of Fact, the Court makes the following Conclusions of Law:

1. Metro followed the guidelines for hiring an appraiser as set out in Trustcorp's Manual. The appraisal on its face did not indicate any defects either in the appraisal or the performance of the appraiser. Therefore, Metro had no reason to contemplate or perform an investigation of the underlying facts of the appraisal.

2. Even if the appraisal did contain material errors or misstatements of material fact, those errors or misstatements were not apparent from the face of the appraisal and therefore Metro has no obligation to repurchase the loan from Trustcorp.

3. Metro did not breach the warranty provisions of the [B]uy/[S]ell Agreement and therefore Metro is not liable for any damages claimed by Trustcorp for failing to repurchase the Shulke loan.

4. There are no genuine issues of material [sic] and the Court concludes as a matter of law that Metro did not breach its Agreement with Trustcorp by refusing to repurchase the Schulke loan, after Trustcorp acceded to Fannie Mae's demand that it repurchase the Schulke loan.

5. The fact that Trustcorp chose to repurchase the Schulke loan from Fannie Mae does not necessarily mean that Trustcorp was in breach of its agreement with Fannie Mae or that Metro is in breach with its agreement with Trustcorp as it relates to the questions regarding the

appraisal. For example, Trustcorp may have acceded to Fannie Mae's demand in order to maintain good business relations as opposed to concluding that it was in breach of contract. In other words, one does not prove the other.

6. There being no genuine issues of material fact, the Court concludes that as a matter of law Metro is entitled to a judgment against Trustcorp on Trustcorp's complaint filed September 9, 2005.

7. Where appropriate or necessary, each of the foregoing conclusions of law shall be considered a finding of fact.

## ORDER AND JUDGMENT

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED AS FOLLOWS:**

\* \* \*

2. Plaintiff, Trustcorp Mortgage company's Motion for Summary Judgment is denied.

3. Defendant Metro Mortgage Co., Inc.'s Motion for Summary Judgment is granted.

4. Judgment is entered in favor of the defendant, Metro Mortgage Co., Inc, and against plaintiff, Trustcorp Mortgage Company on plaintiff's complaint filed on September 9, 2005.

*Id.* at 5–9. This appeal ensued.

■ Initially, we note that the trial court's decision on summary judgment "enters appellate review clothed with a presumption of validity." *Malone v. Basey,* 770 N.E.2d 846, 850 (Ind.Ct.App. 2002). Nevertheless, summary judgment is appropriate only when there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C).

On review of a trial court's decision to grant or deny summary judgment, we apply the same standard as the trial court: we must decide whether there is a genuine issue of material fact that precludes summary judgment and whether the moving party is entitled to judgment as a matter of law. *Carie v. PSI Energy, Inc.,* 715 N.E.2d 853 (Ind.1999). Once the moving party has sustained its initial burden of proving the absence of a genuine issue of material fact and the appropriateness of judgment as a matter of law, the party opposing summary judgment must respond by designating specific facts establishing a genuine issue for trial. *Stephenson v. Ledbetter,* 596 N.E.2d 1369 (Ind. 1992).

■ We may consider only those portions of the pleadings, depositions, and any other matters specifically designated to the trial court by the parties for purposes of the motion for summary judgment. Ind. Trial Rule 56(C) & (H). Any doubt as to the existence of an issue of material fact, or an inference to be drawn from the facts, must be resolved in favor of the nonmoving party. *Cowe v. Forum Group, Inc.,* 575 N.E.2d 630 (Ind.1991). Although the nonmovant has the burden of demonstrating that the grant of summary judgment was erroneous, we carefully assess the trial court's decision to ensure that the nonmovant was not improperly denied his or her day in court. *Colonial Penn Ins. Co. v. Guzorek,* 690 N.E.2d 664 (Ind.1997).

■ Here, the trial court included in its summary judgment order specific findings of fact and conclusions of law. Specific findings and conclusions by the trial court are not required; and, although they offer valuable insight into the trial court's rationale for the judgment as well as facilitate our review, we are not limited to

reviewing the trial court's reasons for granting or denying summary judgment. *Bernstein v. Glavin*, 725 N.E.2d 455 (Ind. Ct.App.2000), *trans. denied.* Rather, a grant of summary judgment may be affirmed upon any theory supported by the designated materials. *Id.* In addition, "[t]he fact that the parties [made] cross-motions for summary judgment does not alter our standard of review. Instead, we must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law." *Meyer v. Marine Builders, Inc.*, 797 N.E.2d 760, 767 (Ind.Ct.App.2003) (citation omitted).

■ The issue presented on appeal requires this court to construe the terms of a written contract and therefore involves a pure question of law. Generally, construction of a written contract is a question of law for the trial court for which summary judgment is particularly appropriate. *Bozarth v. Todd & Langley Const.*, 857 N.E.2d 449 (Ind.Ct.App.2006). Our standard of review in such cases is de novo. *Whitaker v. Brunner*, 814 N.E.2d 288 (Ind. Ct.App.2004).

■ When construing the meaning of a contract, our primary task is to determine and effectuate the intent of the parties. *Id.* First, we must determine whether the language of the contract is ambiguous. "The unambiguous language of a contract is conclusive upon the parties to the contract and upon the courts." *Id.* at 293 (quotation omitted). Thus, if the language of the instrument is unambiguous, the parties' intent will be determined from the four corners of the contract. *Id.*

■ When, on the other hand, the language of a contract is ambiguous, its meaning must be determined by examining extrinsic evidence and its construction is a matter for the fact-finder. *Id.* If, however, the ambiguity arises because of the language used in the contract and not because of extrinsic facts, its construction is purely a question of law to be determined by the trial court. *Bicknell Minerals, Inc. v. Tilly*, 570 N.E.2d 1307 (Ind.Ct.App.1991). This is the case here.

In its order granting summary judgment in favor of Metro, the trial court concluded that Metro did not breach the warranty provisions of the Buy/Sell Agreement with Trustcorp. In so doing, it stated that Metro followed the guidelines for hiring an appraiser as set out in Trustcorp's Manual, and that the appraisal, on its face, did not indicate any defects either in the appraisal itself, or in the performance of the appraiser. The trial court further stated that even if the appraisal did contain material errors or misstatements of material facts, those errors or misstatements were not apparent from the face of the appraisal and therefore Metro had no obligation to repurchase the loan from Trustcorp.

Trustcorp challenges the trial court's findings and conclusions. In so doing, Trustcorp asserts that the trial court erroneously interpreted and construed the written contract between Metro and Trustcorp to require that Trustcorp "establish Metro's awareness or knowledge of deficiencies or defects in an appraisal submitted to support a mortgage loan and/or awareness or knowledge of the failure of the mortgage loan to qualify under Fannie Mae guidelines in order for Trustcorp to establish that Metro breached the contract." *Appellant's Brief* at 9. In so doing, Trustcorp asserts, the trial court erroneously rewrote the contract between the parties when no ambiguity existed. Ultimately, Trustcorp insists that it should have prevailed on its own summary judgment motion because Metro breached its

contract warranties and representations to Trustcorp when it sold a mortgage loan to Trustcorp that failed to "qualify for *re-sale*" to Fannie Mae. *Id.* at 9 (emphasis supplied).

Metro, on the other hand, claims that it did everything it was required to do pursuant to Sections 106 and 106.1 in obtaining a valid appraisal. In particular, Metro points out that Johnson's appraiser's license was valid, that he submitted his resume to Metro, and that Johnson included all the required supporting documents with his appraisal of the Schulke property.

Metro further asserts that the "qualify for" phrase contained in Section 103 of the Manual, and upon which Trustcorp relies, is an awkward phrase subject to different interpretations. Specifically, Metro points out that the Buy/Sell Agreement does not contain the phrase "eligible for *sale*," and argues that if that was Trustcorp's true intent, as the drafter of the Agreement, it could and should have included such language in the Agreement. *Appellee's Brief* at 10, 13 (emphasis supplied). Metro also points out that qualifying for a Fannie Mae loan requires compliance with a multitude of items dealing with the credit-worthiness of the borrower and his ability to repay the loan. Thus, Metro concludes, the phrase "qualify for" is a generic term that encompasses more than avoidance of error, misstatement of fact, or other material misrepresentation. We agree.

The specific language of Section 103, paragraph 4 of the Manual states that it shall be the responsibility of the Seller (here, Metro) "[t]o only originate, process, or close those loans under this Agreement *which qualify for* either FHA/VA, Federal National Mortgage Association ['Fannie Mae'], Federal Home Loan Mortgage Corporation, Government National Mortgage Association, or other investors for whom PURCHASER either sells or services

loans[.]" *Appendix* at 57 (emphasis supplied). This language arguably could support either of the views advanced by the parties, as set forth above, as to what "qualify for" means. Therefore, contrary to Trustcorp's assertion on appeal, this contract language is ambiguous.

■■■■ We begin the task of resolving this ambiguity by examining the Buy/Sell Agreement in its entirety. When interpreting a written contract, we attempt to determine the intent of the parties at the time the contract was made. *Whitaker v. Brunner,* 814 N.E.2d 288. We do this by examining the language used in the instrument to express the parties' rights and duties. *Id.* We must also read as a whole and attempt to construe the contractual language so as not to render any words, phrases, or terms ineffective or meaningless. *Id.* Likewise, we must accept an interpretation of the contract that harmonizes its provisions, rather than one that places the provisions in conflict. *Id.* Lastly, we note that when the language of a contract is ambiguous and susceptible to more than one interpretation, as is the case here, we construe the contract against the party responsible for the wording, here, Trustcorp. *INB Banking Co. v. Opportunity Options, Inc.,* 598 N.E.2d 580 (Ind.Ct.App.1992).

■■■■ After reviewing the contract language of the Buy/Sell Agreement and Manual, it appears to us that the best interpretation of the phrase "qualify for" does not include the insertion of the term "resale" as Trustcorp would have us do. In interpreting a contract, we give the language of the contract its plain and ordinary meaning. *Erie Ins. Co. v. American Painting Co.,* 678 N.E.2d 844 (Ind.Ct.App. 1997), *trans.denied.* Webster's dictionary defines "qualify" as "to be or become fit: meet the required standard." *Merriam–*

*Webster Online Dictionary*, (2007) http://www.m-w.com/dictionary/qualify.

Section 103, paragraph 4, of the Manual states that Metro will "only originate, process, or close those loans . . . which qualify . . . for Fannie Mae" and other investors Trustcorp may subsequently sell to. *Appendix* at 57. A plain and ordinary reading of this phrase leaves this court convinced that Metro only guaranteed that all the elements necessary for obtaining a Fannie Mae loan, as set forth in the Buy/Sell Agreement, were performed—not that all the documents, including the appraisal, were flawless.

In satisfying its obligation to Trustcorp, Metro obtained the services of Johnson, a licensed appraiser, pursuant to the terms of the parties' Agreement. Additionally, it is undisputed that Johnson submitted all necessary forms and documents with the Schulke Appraisal, as well as provided Metro with a copy of his resume and Appraiser's license as required by section 106.1 of the Manual. Uncontroverted evidence further establishes that there were no flaws or defects on the face of the Johnson Appraisal. Moreover, Trustcorp's awareness of the fact that Metro could not absolutely guarantee that all of its origination documents were flawless, and that they might contain unknown inaccuracies, is evidenced by the language contained in subparagraph 3.6 of the "WARRANTIES AND REPRESENTATION" section of the Buy/Sell Agreement which stated, "Seller has made diligent inquiry into all material facts and circumstances in the making of the loan . . . and as far as the Seller is aware, all submitted documents are genuine and valid. . . . Seller shall promptly notify Purchaser if it becomes aware of any such errors or misstatements." *Id.* at 47. Thus Trustcorp knew it was possible for origination documents to contain errors and misstatements of fact, and made specific provisions to address when that occurred. To interpret the language of the contract to require Metro to produce flawless documents in all circumstances in light of this language would render this section of the contract meaningless. This we cannot do.

As stated earlier, any ambiguity in the contract language is to be construed against the drafting party. *Bicknell Minerals, Inc. v. Tilly*, 570 N.E.2d 1307. We therefore conclude that the "qualified for" language contained in the Buy/Sell Agreement did not impose a duty on Metro to provide a flawless appraisal in its origination documents, but that it simply required Metro to comply with all of Trustcorp's requirements in obtaining the appraisal. As a mortgage broker, Metro was not in the business of performing property appraisals. That was the job of the appraiser. To hold Metro responsible for any and all unknown or hidden defects contained in the appraisal would in effect require Metro to become an appraiser. This result, clearly, was not intended by the parties.

Metro did not agree, either explicitly, or implicitly, to act as an appraiser or to guarantee that the appraisal itself was flawless. Instead, the language of the Agreement clearly shows that Metro agreed to obtain a licensed appraiser to appraise the property and include said appraisal, along with all necessary supporting documents mandated by the Buy/Sell Agreement, in the origination documents. Metro, Trustcorp, and Fannie Mae thereafter each relied on Johnson, to act as the appraiser and to provide an appraisal that met industry and professional standards.

Based on the foregoing, we conclude that the designated evidence establishes that Metro did not contract to provide a perfect appraisal, but that it agreed to produce origination documents, including an appraisal, in accordance with the re-

quirements drafted by Trustcorp and set forth in the Buy/Sell Agreement. Furthermore, in obtaining a licensed appraiser, and in satisfying all other requirements set forth in Sections 106 and 106.1, Metro fulfilled its contractual obligations and was therefore not in breach of its contract with Trustcorp when it refused to repurchase the Schulke loan. The fact that both Trustcorp and Fannie Mae subsequently purchased the Schulke loan further substantiates our conclusion that Metro's origination documents did in fact "qualify for" Fannie Mae.

Judgment affirmed.

CRONE, J., concurs.

BAKER, C.J., dissents with separate opinion.

BAKER, Chief Judge, dissenting.

I respectfully dissent from the majority's interpretation of the Buy/Sell Agreement and from the ultimate disposition of this matter. Initially, I quarrel with the application of the rule by which we construe an ambiguity in contract language against the drafting party. Op. p. 214. Here, the contracting parties were two large, sophisticated businesses that regularly entered into agreements that are similar to the one at issue herein. Under these circumstances, I believe that there should not be an automatic presumption against the drafting party, inasmuch as both parties are on equal footing with respect to the content, negotiation, and application of the agreement.

Moreover, I find a well-established, long-standing rule to be instructive: "Public policy holds that he who is best able to avoid a loss should bear it." *Provident Bank v. Tri–County Southside Asphalt, Inc.,* 804 N.E.2d 161, 165 (Ind.Ct.App. 2004). This rule is rooted in common sense and its application fosters laudable business efficiency. We have had occasion in the past to expound upon this rule and its history:

> The famous case of *Phelps v. McQuade,* 220 N.Y. 232, 115 N.E. 441 (1917), was the genesis of Uniform Commercial Code section 2–403. In *Phelps,* Gwynne falsely represented himself to a jewel vendor and obtained jewelry on credit from Phelps. Gwynne then sold the jewelry to McQuade. Phelps filed a claim for replevin of the jewelry, arguing that under common law title did not pass to McQuade. The *Phelps* court, however, noted that it was the "intention of the person having title to the goods and delivering them to another" that determined whether good title then passed to a purchaser for value. *Id.* at 442. Thus, the *Phelps* court held that Phelps had to bear the economic loss due to Gwynne's false representation because Phelps had dealt directly with Gwynne.
>
> The Uniform Commercial Code drafters incorporated the sound policy behind the result in *Phelps.* The drafters noted that U.C.C. section 2–403 was "predicated on the policy that where a transferor has voluntarily delivered the goods to a purchaser, he, the transferor, ought to run the risk of the purchaser's fraud as against innocent third parties." U.C.C. § 2–403, comment 4 (2002). The policy is just[,] inasmuch as he who deals directly with a person is in the best position to prevent a financial injury. *See M & K Corp. v. Farmers State Bank,* 496 N.E.2d 111, 112 (Ind.Ct.App.1986) (holding that the "employer is normally in a better position to prevent such forgeries by reasonable care in the selection or supervision of his employees").

*Id.* Here, Metro was the party that dealt with the debtor and was closest to the appraiser and the flawed appraisal. Un-

der these circumstances, it is apparent that Metro was best able to avoid this loss and that, consequently, Metro should have to bear it.

Moreover, the Buy/Sell Agreement and the Manual establish that the parties intended that Metro bear the risk of loss. In the Buy/Sell Agreement, Metro "warrant[ed], represent[ed] and covenant[ed]" to Trustcorp that "[t]he note and mortgage are good, valid and enforceable instruments, free of defect or objection," that the loan meets all of Trustcorp's requirements, and that Metro "has made diligent inquiry into all material facts and circumstances in the making of the loan. . . ." Appellant's App. p. 46–49. Moreover, "it is the intention of [Metro] and [Trustcorp] that [Trustcorp] be entitled to rely on [Metro's] representations and warranties. . . ." *Id.*

And the Manual explicitly requires that it is Metro's responsibility "[t]o only originate, process, or close those loans under this agreement which qualify for either FHA/VA, Federal National Mortgage Association . . . or other investors. . . ." *Id.* at 56–57. Further, Metro "is responsible for determining the acceptability of the appraiser. . . ." *Id.* Because common sense dictates and the parties clearly intended that Metro should bear the risk of loss stemming from a fraudulent or faulty appraisal, I would reverse the judgment of the trial court and direct it to enter judgment in favor of Trustcorp.