FILED

Mar 27 2023, 8:30 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Earl McCoy
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Brian A. Karle
Ball Eggleston, PC
Lafayette, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Lafayette Rentals, Inc., <br> *Appellant-Respondent,* <br><br> v. <br><br> Low Cost Spay-Neuter Clinic, Inc., <br> *Appellee-Petitioner* | March 27, 2023 <br><br> Court of Appeals Case No. 22A-PL-362 <br><br> Appeal from the Tippecanoe Superior Court <br><br> The Honorable Daniel Moore, Judge <br><br> Trial Court Cause No. 79D07-2106-PL-68 |

**Opinion by Judge May**
Judges Mathias and Bradford concur.

**May, Judge.**

[1] Lafayette Rentals, Inc. ("LR Inc.") appeals the trial court's judgment following a bench trial in a suit against Low Cost Spay-Neuter Clinic, Inc. ("Clinic") in which each party alleged the other party breached a lease agreement, and the Clinic cross-appeals. The parties raise three issues, which we revise and restate as:

> 1. Whether the trial court erred when it found the Clinic did not default on its lease by failing to timely pay its rent;
>
> 2. Whether the trial court erred when it ordered LR Inc. to replace the exterior HVAC system if the system failed; and
>
> 3. Whether the trial court erred when it awarded LR Inc. $2,000 of the $11,325 that LR Inc. sought in attorney fees and when it did not award attorney fees to the Clinic.

We affirm in part, reverse in part, and remand.

## Facts and Procedural History

[2] The Clinic is a not-for-profit corporation that provides low-cost veterinary services at multiple locations in central Indiana. In 2018, the City of Lafayette, the City of West Lafayette, and Tippecanoe County invited the Clinic to open a Lafayette location and, to entice the Clinic to open such a location, offered to pay the Clinic's rent for its first three years of operation. The Clinic agreed to open a Lafayette location, and it leased space in a strip mall owned by LR Inc.

The Lease term ran from November 4, 2018, through December 31, 2023. In relevant part, the Lease provided:

5. **MINIMUM RENTAL.**

a. Lessee, without demand or notice, shall pay Minimum Rental ("Rent") in monthly payments as follows:

\* \* \* \* \*

All such Rent shall be due and payable in advance, on or before the 1st day of each month. Said Rent payment shall be made by electronic payment from Lessee to Lessor, in accordance with information provided by Lessor to Lessee.

\*\*\*\*\*

c. Rent shall be due and payable on the 1st day of each month during the Term of this Lease. There shall be late charges for failure to pay Rent commencing on the 3rd day of each month in the amount of five percent (5%) of the minimum monthly rent. The Lessee's liability to pay Rent or perform any other promises under this Lease shall be without relief from valuation and appraisement laws.

\*\*\*\*\*

9. **COLLECTION COSTS AND ATTORNEY FEES.** In the event any installment of the Rent or Common Area Maintenance Costs herein or hereafter provided, or any other charges payable to Lessor hereunder are not paid when due, a late charge as provided by the paragraph labeled Minimum Rental, as well as reasonable attorneys' fees and collection costs incurred in the

collection of said rent, shall be included as outstanding rent due and owing.

10. **USE OF PREMISES.** … All deliveries of merchandise or other items to Lessor's Building shall be delivered at the rear of the Building, through the back door of the Building. Parcel and mail deliveries may, with the consent of Lessor, be made through the front door of the Building.

11. **MAINTENANCE OF LEASED PREMISES.** Lessor shall keep and maintain the roof and structural portions of the exterior walls of the Leased Premises and Building, unless such maintenance is a result of negligence on the part of the Lessee. Lessee shall be responsible for damage to windows, doors, window and door frames, and glass (plate glass or otherwise), unless such damage is a result of structural failure or negligence on the part of the Lessor. Lessee, at its sole cost and expense, shall maintain in good and safe order, condition, repair, and replacement, all other portions of the Leased Premises, ordinary wear and tear excepted.

12. **INSTALLATIONS AND ALTERATIONS.** Lessee shall, at Lessee's sole cost and expense, at all times during the Term of this Lease, keep the Leased Premises equipped with all trade fixtures, equipment, furnishings, furniture, fixtures, floor coverings, carpeting and exterior signs (only as permitted by Lessor) and all other equipment and personal property necessary for the first class operation of Lessee's business on the Leased Premises. Prior to commencing any construction work, alterations, remodeling or the installation of any equipment other than trade fixtures on the Leased Premises, Lessee shall submit to Lessor plans and specifications of any such construction work. All contractors to be used by Lessee to perform Lessee's work, or any work subsequent to Lessor's Work shall be approved by Lessor, in writing, which approval shall not be unreasonably withheld, prior to the commencement of any such work.

Lessee shall not make or permit to be made any alterations, improvements, or additions of any kind or nature to the Leased Premises or any part thereof except with the prior written consent of Lessor, which consent shall not be unreasonably withheld. All alterations, improvements and additions to the Leased Premises shall be made in accordance with all applicable laws and codes and shall, when made or installed, be deemed to have attached to the freehold and to have become the property of Lessor and shall remain for the benefit of Lessor at the end of the Term or the earlier termination of this Lease except for any business trade fixtures and equipment which items shall remain the property of Lessee. In the event of making such alterations, improvements and/or additions as herein provided, Lessee does hereby indemnify and save harmless Lessor from all expenses, liens, claims or damages to either person or property arising out of, or resulting from the undertaking or making of such alterations, improvements and/or additions.

*****

14. **LESSEE PARKING.** The Lessor shall make available from time to time within the Common Area (including but not limited to parking areas, driveways, truck ways, delivery passages, truck loading areas, walkways, sidewalks) parking as the Lessor alone from time to time deems appropriate. The Lessor may, from time to time, change the size, location, elevation, nature, and the use of any common areas and make installations thereon, and move and remove the same. The Lessee and its officers, employees, agents, customers and all others to whom the Lessor has or may hereafter grant such right, to use the Common Areas as designated from time to time by the Lessor subject to such reasonable rules and regulations as the Lessor may from time to time impose, including the designation of specific areas in which cars operated by the Lessee, its officers, employees and agents shall be parked. The Lessee agrees to abide by the rules and

regulations and to use its best efforts to cause its officers, employees, and agents to conform thereto.

\*\*\*\*\*

22. **COST OF ENFORCING LEASE.** For so long as Lessee shall continue to perform its obligations under the Lease, Lessee's rights under the Lease shall not be impaired and Lessee's peaceful and quite [sic] enjoyment of the Leased Premises shall not be disturbed by any party claiming by, through or under Lessor. The Lessee shall pay all reasonable costs, charges, attorney's fees and expenses incurred by Lessor in enforcing any of the terms of this Lease. In the event of litigation, the prevailing party shall be entitled to recover all reasonable costs, charges, attorney's fees, and expenses incurred in enforcing any covenant, agreement, and/or condition contained in this Lease, unless such charges and expenses are incurred in any dispute wherein the Lessor and Lessee are in agreement and have a dispute with a third party.

\*\*\*\*\*

29. **DEFAULT BY LESSEE**. Upon the happening of any one (1) or more of the events as expressed below in (a) through (h) inclusive ("Event of Default") the Lessor shall have any and all rights and remedies hereinafter set forth in this Section:

(a) In the event Lessee shall fail to pay any one (1) or more of the monthly installments of Minimum Rent, as and when the same becomes due and the failure continues for ten (10) days after written notice is given by Lessor to Lessee;

\*\*\*\*\*

(h) In the event Lessee violates any other terms, conditions and covenants on the part of Lessee herein contained, and fails to commence and proceed with diligence and dispatch to remedy the same within (10) days after written notice thereof is given by Lessor and Lessee.

In the event of any such default or breach as specified above, the Lessor shall have the right, at the option of Lessor, to terminate this Lease and to thereupon reenter and take possession of the Leased Premises with or without legal process.

(LR Inc.'s App. Vol. II at 15-25.)

[3] The Clinic invested approximately $553,000 into renovating and equipping the leased space, and the Lafayette location opened for customers on February 9, 2019. The Clinic periodically sent LR Inc. e-mails seeking resolution of various issues related to maintenance of the property. On July 22, 2020, the Clinic sent LR Inc. a letter noting various building defects, including roof leaks, exterior window leaks, issues with the building's heating, ventilation, and air conditioning ("HVAC") system, and unsightly common areas. The Clinic requested that LR Inc. make repairs to address the problems. At some point in 2020, the Clinic replaced one of two air conditioning units servicing the Lafayette location, and the Clinic asked LR Inc. to reimburse it $4,700 for the cost of replacement.

[4] On June 3, 2021, LR Inc. sent a letter to Tammy Sollenberger, the Clinic's Executive Director, alleging the Clinic had breached the rental agreement by receiving deliveries in the front of the building, not using "Cozy.co" to submit

payments electronically, failing to pay common area maintenance costs, and failing to properly maintain the HVAC system. (*Id.* at 31.) This letter also stated: "Please consider this your written notice to correct the above issues. Failure to correct these issues in 10 days will be considered a violation of your lease and subject to termination." (*Id.* at 32.) On June 15, 2021, Huntington Bank, acting on behalf of the Clinic, sent a physical check to LR Inc. to pay the Clinic's July rent. This physical check was never cashed. On June 22, 2021, LR Inc. sent a second letter to Sollenberger that stated:

> You are hereby notified that your lease has been terminated effective Thursday July 22, 2021, at 12:00 pm (noon). This is a result of your refusal to comply with the following terms of your lease:
>
> Parking – Notification given on June 3, 2021
>
> Maintenance of leased premises – Notification given on June 3, 2021

(*Id.* at 33.)

[5] On June 29, 2021, the Clinic filed suit against LR Inc. alleging breach of contract by LR Inc. because LR Inc. failed to make or pay for necessary repairs. The complaint sought damages and declaratory relief. The Clinic also filed a motion for a preliminary injunction requesting that LR Inc. be "enjoined from entering the leased premises leased by the clinic, changing its locks, interfering with the lease, or otherwise interfering with the leased premises without the written consent of the Clinic or the permission of the Court." (*Id.* at 36.)

[6]    On July 2, 2021, LR Inc. sent the Clinic another letter that stated:

> As advised by our attorney we are submitting written notice of the following items regarding your tenancy at [street address].
>
> <u>Payment of Rent & Common Area Maintenance Costs</u> – You have not paid the rent or Common Area Maintenance Costs which was due July,[sic] 1 2021.
>
> Please consider this your written notice to correct the above issues.  Failure to correct these items in 10 days will be considered a violation of your lease and subject to termination.

(*Id*. at 51) (emphasis in original).  On July 13, 2021, LR Inc. sent the Clinic an additional letter that stated:

> You are hereby notified that your lease has been terminated effective Thursday July 22, 2021, at 12:00 pm (noon).  This is a result of your refusal to comply with the following terms of your lease:
>
> Rent & monthly CAM installment- Notification given on July 2, 2021
>
> The above rent & monthly CAM installment is in addition to the Parking, delivery and Maintenance termination notice provided on June 22, 2021.

(*Id*. at 52.)

[7]    On July 21, 2021, the trial court held a hearing on the Clinic's motion for a preliminary injunction.  At the hearing, Sollenberger testified that she believed

LR Inc.'s complaints regarding the Clinic's performance of its lease obligations were in retaliation for the Clinic's maintenance requests. The trial court then issued an order granting the Clinic's motion. The trial court forbade LR Inc. from "excluding [the Clinic] from occupancy or use of the leased premises while this case is pending or until further order of the Court[.]" (*Id*. at 44.) The trial court also ordered the Clinic to post a $25,000 bond as security for LR Inc.

[8] On July 23, 2021, LR Inc. filed an answer to the Clinic's complaint and a counterclaim alleging the Clinic breached the lease agreement and was in default. On July 28, 2021, the Clinic electronically wired rent payments to LR Inc. for the rent due covering the months of July and August 2021. The Clinic then began electronically paying its rent every month.

[9] At a status conference on October 29, 2021, both parties agreed the preliminary injunction order could be vacated because LR Inc. committed to not interfering with the Clinic's possession of the premises during the pendency of this action. The Clinic explained it had never posted the bond because it relied on LR Inc.'s assurance that it would not interfere. On November 1, 2021, the trial court issued an order vacating its preliminary injunction order.

[10] The trial court held a bench trial on November 30, 2021. At trial, Brent Driscoll, a heating and cooling technician, testified that the second air conditioning unit servicing the Clinic's Lafayette location "was definitely struggling" and recommended that the unit be replaced. (Tr. Vol. II at 9.) He explained this was the result of the unit's age and not because of poor

maintenance. Sollenberger testified the window leak and HVAC issues remained unrepaired. She also testified the Clinic was current on its rent and common area maintenance fees. Jeff Baker, LR Inc.'s Vice President, testified he repaired the window air leak and the roof leak, but he stated he believed HVAC maintenance was the tenant's responsibility. Baker also testified the Clinic was late in paying rent twenty-two times, but Baker acknowledged he never charged the Clinic a late rent fee. At the conclusion of trial, LR Inc.'s counsel submitted an affidavit attesting that LR Inc. incurred $11,325.00 in attorney fees. The Clinic's attorney submitted an affidavit in which he averred the Clinic incurred $18,197.50 in attorney fees.

[11]  LR Inc. requested the trial court enter findings of fact and conclusions of law in accordance with Trial Rule 52, and on January 21, 2022, the trial court issued its order. The trial court found:

> 8. The Lease was drafted by LR INC.
>
> * * * * *
>
> 30. The Clinic parks its delivery van overnight on the west end of the parking lot in a lighted area. LR INC has designated an area in the back of the business for overnight parking. The clinic had been parking in front for nearly a year prior to the landlord's complaint and believes the front area to be a safer reasonable parking space.
>
> * * * * *

36. In June and July of 2021 rent checks for July and August of 2021 were mailed from Huntington Bank to LR INC. For unknown reasons these checks were not received and not cashed. The Clinic was unaware of this issue until receiving LR INC's ten-day notice on July 2, 2021. The Clinic remedied the issue and LR INC received both payments prior to the end of July.

37. The Court does not find that the Clinic failed to pay rent as contemplated by the lease. Neither party has established what happened to the checks once mailed, but the evidence does establish that said checks were timely sent to LR INC and then, when informed of the lack of receipt, the Clinic acted timely in stopping the checks and reissuing payment. The Clinic did not fail to pay rent.

38. The Court does not credit LR INC's testimony that 22 payments were late and notes that LR INC did nothing to address those alleged late payments prior to the instant issues between the parties.

*****

42. The Clinic filed its complaint on June 29, 2021. Plaintiff also sought a temporary restraining order. On July 22, 2021 the Clinic, after a contested hearing, was granted a preliminary injunction with respect to LR INC retaking possession of the property. The Clinic never posted the bond ordered by the Court to perfect that injunction. LR INC was forced to retain counsel to defend against the Clinic's injunction request.

(LR Inc.'s App. Vol. II at 57, 61-62.) The trial court also concluded the Clinic breached the Lease Agreement by having oxygen delivered to the front of the

building and by failing to make electronic payments of rent before July 2021. With respect to the HVAC system, the trial court concluded:

> 2. The lease is ambiguous as to the responsibility for the HVAC system. Paragraphs 11 and 12 generally make the Clinic responsible for maintenance and replacement of the "leased premises" and all fixtures and equipment therein. Paragraph 1 generally defines the "leased premises" as a 6,000 square foot **interior** space. (emphasis added). The HVAC system, while being a fixture, has both interior and exterior components. LR INC is generally responsible for structural and exterior matters. The Court concludes that with respect to the HVAC system the lease generally leaves Clinic responsible for maintenance of the same but requires that LR INC be responsible for replacement of the exterior portions of the system should they fail to work.
>
> 3. The Clinic has not met its burden that replacement is necessary. The testimony is that replacement was advisable and financially beneficial, but that repair was possible. Should Clinic choose to replace rather than repair said units for its benefit, the lease does not prevent the same, but the Court does not determine that LR INC is responsible for that cost. Should replacement be necessary of the exterior portions of the units, LR INC is responsible pursuant to the lease.

(*Id*. at 63.)

[12] The trial court granted the Clinic's request for a declaratory judgment that the lease between the parties remain valid and ordered the Clinic was entitled to possession of the leased premises. The trial court denied the Clinic's request for damages with respect to the HVAC replacement, but the trial court did grant the Clinic's request that LR Inc. repair the window air leak. The trial court

denied LR Inc.'s request to terminate the lease. The trial court did grant LR Inc.'s "counterclaim with respect to the designated parking of the Van and other minor breaches." (*Id.* at 65.) The trial court then entered judgment in favor of LR Inc. on its counterclaim for $1.00. With respect to attorney fees, the trial court concluded:

> 10. Both sides have incurred attorney's fees in this matter. LR INC incurred some attorney's fees in defending against an injunction that the Clinic received but refused to perfect. Further, while not awarding possession or termination of the lease, LR INC has prevailed in its counter-claim for breach and incurred attorney's fees therein. The Court finds that $2,000.00 is reasonable fees related to defending the injunction and the issues on which LR INC has prevailed.

(*Id.*)

# Discussion and Decision

[13] LR Inc. contends that, because LR Inc. did not receive the July 2021 rent payment on time, the trial court should have found the Clinic was in default and ordered the Clinic to vacate. LR Inc. also argues the trial court misinterpreted the parties' lease agreement in assigning LR Inc. responsibility for the exterior portions of the HVAC system. Both parties assert the trial court erred in its apportionment of attorney fees.

[14] "A lease is construed in the same manner as any other contract." *Floyd v. Rolling Ridge Apartments*, 768 N.E.2d 951, 954 (Ind. Ct. App. 2002). Our

primary objective in interpreting a contract is to determine the intent of each party when they entered the contract. *Celadon Trucking Serv., Inc. v. Wilmoth*, 70 N.E.3d 833, 839 (Ind. Ct. App. 2017), *trans. denied*. "We do this by examining the language used in the instrument to express the parties' rights and duties." *Trustcorp Mortg. Co. v. Metro Mortg. Co., Inc.*, 867 N.E.2d 203, 213 (Ind. Ct. App. 2007), *reh'g denied*. We read the contract "as a whole and attempt to construe the contractual language so as not to render any words, phrases, or terms ineffective or meaningless." *Id*. We look to interpret the contract in a manner that "harmonizes its provisions, rather than one that places the provisions in conflict." *Id*. Moreover, "when the language of a contract is ambiguous and susceptible to more than one interpretation … we construe the contract against the party responsible for the wording[.]" *Id*.

[15] Here, upon LR Inc.'s written motion, the trial court entered findings of fact and conclusions of law pursuant to Trial Rule 52. Thus, we employ a well-settled two-tiered standard of review. *Trabucco v. Trabucco*, 944 N.E.2d 544, 548 (Ind. Ct. App. 2011), *trans. denied*.

> First, we determine whether the evidence supports the findings and second, whether the findings support the judgment. In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment. We do not reweigh the evidence but consider only the evidence favorable to the trial court's judgment. Challengers must establish that the trial court's findings are clearly erroneous. Findings are clearly erroneous when a review of the record leaves us firmly convinced a mistake has been made. However, while we defer substantially

> to findings of fact, we do not do so to conclusions of law.
> Additionally, a judgment is clearly erroneous under Indiana Trial
> Rule 52 if it relies on an incorrect legal standard. We evaluate
> questions of law de novo and owe no deference to a trial court's
> determination of such questions.

*Carmichael v. Siegel*, 754 N.E.2d 619, 625 (Ind. Ct. App. 2001) (internal citations omitted) (cleaned up).

## 1. Rent

LR Inc. contends the trial court erred in Findings 36 through 38 when it did not find the lease agreement terminated after LR Inc. did not receive the July 2021 rent payment within ten days after sending the July 2, 2021, letter. LR Inc. contends the lease agreement terminated at that point pursuant to both Indiana Code section 32-31-1-6 and the terms of the lease agreement. Indiana Code section 32-31-1-6 provides: "If a tenant refuses or neglects to pay rent when due, a landlord may terminate the lease with not less than ten (10) days notice to the tenant unless: (1) the parties otherwise agreed; or (2) the tenant pays the rent in full before the notice period expires." Likewise, the lease agreement provided the Clinic would be in default "[i]n the event Lessee shall fail to pay any one (1) or more of the monthly installments of Minimum Rent, as and when the same becomes due and the failure continues for ten (10) days after written notice is given by Lessor to Lessee." (LR Inc.'s App. Vol. II at 24.)

Chad Gingrich, an employee of Huntington Bank, testified at trial that a paper check meant to cover the Clinic's July 2021 rent payment was issued on June

15, 2021, and a check meant to cover the Clinic's August 2021 rent was issued on July 15, 2021. The trial court credited this testimony and found "[n]either party has established what happened to the checks once mailed, but the evidence does establish that said checks were timely sent to LR INC and then, when informed of the lack of receipt, the Clinic acted timely in stopping the checks and reissuing payment." (*Id.* at 62.) Until July 2021, the Clinic consistently paid its rent by means of a paper check. Baker accepted the checks and never charged the Clinic a fee for late payment of rent. Consequently, the trial court found Baker's testimony that the Clinic was habitually late in paying rent not credible. Thus, evidence supported the trial court's finding that the Clinic was not in default for failing to pay rent. *See, e.g., Richardson v. Hansrote*, 883 N.E.2d 1165, 1177 (Ind. Ct. App. 2008) (holding Father who paid child support by means of an income withholding order was not in arrears when the trial court clerk received the support payment on the first working day after the end of the month), *reh'g denied*. LR Inc.'s request that we reverse this finding is nothing more than an invitation to reweigh the evidence and judge witness credibility, which our standard of review precludes us from doing. *See Trabucco*, 944 N.E.2d at 556 ("Husband's argument is simply a request to reweigh the evidence, which we will not do on appeal.").

## 2. HVAC

[18] The trial court concluded "with respect to the HVAC system the lease generally leaves Clinic responsible for maintenance of the same but requires that LR INC be responsible for replacement of the exterior portions of the system should they

fail." (LR Inc.'s App. Vol. II at 63.) LR Inc. challenges this conclusion and argues "[t]he trial court incorrectly interpreted the lease agreement when making its finding in regard to the HVAC system." (LR Inc.'s Br. at 17.) LR Inc. contends from "the plain language of the agreement…it is clear that the HVAC unit was to be considered a fixture and not an exterior structure making the Clinic was [sic] responsible for replacing." (*Id.*)

[19] The lease agreement does not specifically mention maintenance or replacement of the HVAC system. Section 11 of the lease agreement provides LR Inc. "shall keep and maintain the roof and structural portions of the exterior walls of the Leased Premises and Building, unless such maintenance is a result of negligence on the part of the Lessee." (LR Inc.'s App. Vol. II at 18.) The agreement then assigns the Clinic the responsibility for damage to windows, doors, window and door frames, and glass unless the damage is the result of a structural failure or negligence of LR Inc. The agreement also states that the Clinic "at its sole cost and expense, shall maintain in good and safe order, condition, repair and replacement, all other portions of the Leased Premises, ordinary wear and tear excepted." (*Id.*) Likewise, section 12 of the lease agreement governs installations and alterations to the "Leased Premises" by the Clinic. (*Id.* at 18-19.) The lease agreement defines the "Leased Premises" as "approximately 6,000 sq. ft., of gross *interior* space[.]" (*Id.* at 15) (emphasis added). Because the lease agreement defines the Leased Premises as the interior space rented by the Clinic and assigns responsibility for the roof and external structural portions of the building to LR Inc., the trial court did not err

in concluding LR Inc. was responsible for the eventual replacement of the external portions of the HVAC system. *See Simon Prop. Grp., L.P. v. Mich. Sporting Goods Distrib., Inc.*, 837 N.E.2d 1058, 1074 (Ind. Ct. App. 2005) (holding plain language of lease agreement supported trial court's ruling that tenant's exclusive remedy was a reduction in rent), *trans. denied*.

### 3. Attorney Fees

[20] Both parties contest the trial court's award of attorney fees. LR Inc. contends the trial court abused its discretion when it reduced LR Inc.'s attorney fee award without providing an appropriate rationale. The Clinic asserts the trial court erred when it awarded attorney fees to LR Inc. because the Clinic was the prevailing party and, pursuant to section 22 of the lease agreement, the trial court should have awarded attorney fees to the Clinic. We review the amount of a trial court's award of attorney fees under an abuse of discretion standard. *White v. Szalasny*, 191 N.E.3d 260, 263 (Ind. Ct. App. 2022). "An abuse of discretion occurs when the trial court's award is clearly against the logic and effect of the facts and circumstances before the court." *Id*.

[21] Indiana follows the "American Rule" whereby "each party pays its own attorney's fees; and a party has no right to recover them from the opposition unless it first shows they are authorized." *River Ridge Dev. Auth. v. Outfront Media, LLC*, 146 N.E.3d 906, 912 (Ind. 2020). "A contract that allows for the recovery of attorney fees will be enforced according to its terms unless it is violative of public policy." *Salcedo v. Toepp*, 696 N.E.2d 426, 235 (Ind. Ct. App.

1998). Section 22 of the parties' lease agreement provides: "In the event of litigation, the prevailing party shall be entitled to recover all reasonable costs, charges, attorney's fees, and expenses incurred in enforcing any covenant, agreement, and/or condition contained in this Lease[.]" (LR Inc.'s App. Vol. II at 23.)

[22] The Clinic contends it was the "prevailing party" because it was victorious on the "main issue" which was "termination of the lease and possession of the premises." (Clinic's Br. at 16.) In *Reuille v. E.E. Brandenberger Constr. Inc.*, our Indiana Supreme Court explained the "prevailing party" is "'[t]he party to a suit who successfully prosecutes the action or successfully defends against it, prevailing on the main issue, even though not necessarily to the extent of his original contention. The one in whose favor the decision or verdict is rendered and judgment entered.'" 888 N.E.2d 770, 771 (Ind. 2008) (quoting Black's Law Dictionary 1188 (6th ed. 1990)). The Clinic's complaint sought damages for LR Inc.'s alleged failures to make repairs and "a Declaratory Judgment that the plaintiff is not in breach of the Lease Agreement, and the defendant is not entitled to terminate the Lease Agreement[.]" (LR Inc.'s App. Vol. II at 14.) Likewise, LR Inc.'s counterclaim alleged the lease agreement terminated as a result of a default by the Clinic, and LR Inc. asserted it was entitled to and requested "the Court to enter an order granting it possession of the leased premises and ordering [the Clinic] to vacate the property." (*Id.* at 49.) Thus, the primary issue being litigated by the parties was possession of the premises, and the Clinic won on that issue. In fact, LR Inc. concedes "[t]he Court did not

find that LR INC prevailed in its main issue, being the termination of the lease."[1] (LR Inc.'s Br. at 21.) Therefore, because the Clinic prevailed on the main issue, it was entitled to an award of attorney fees based on the terms of the lease agreement. *See Baker v. Paschen*, 188 N.E.3d 486, 492-93 (Ind. Ct. App. 2022) (holding—in litigation unrelated to the instant case—that tenant was entitled to recovery of attorney fees against Jeffery Baker and LR Inc. pursuant to terms of lease agreement), *reh'g denied*, *trans. denied*. LR Inc. did receive an award of nominal damages, and the trial court vacated its preliminary injunction order prior to trial. However, the lease agreement limited recovery of attorney fees to the "prevailing party" and the Clinic was the prevailing party. (LR Inc.'s App. Vol. II at 23.) Consequently, LR Inc. was not entitled to an award of attorney fees. Therefore, we reverse the trial court's award of attorney fees to LR Inc. and remand for the trial court to award attorney fees to Clinic. *See Bruno v. Wells Fargo Bank, N.A.*, 850 N.E.2d 940, 951 (Ind. Ct. App. 2006) (holding remand was necessary to calculate attorney fees award).

---

[1] In its reply brief, LR Inc. asserts:

> Although it was stated in the Appellant's Brief that the trial court did not find that LR Inc prevailed in its main issue, this was clearly an accidental misstatement in the Appellant's Brief . . . . The main issue in the Appellant's counterclaim was whether or not the Clinic had breached the terms of the lease.

(LR Inc.'s Reply Br. at 8.) However, it is well-settled that a party may not raise an argument for the first time in its reply brief, and LR Inc. did not argue it was the prevailing party in its initial brief. *See Akin v. Simons*, 180 N.E.3d 366, 375 (Ind. Ct. App. 2021) ("the law is well settled that grounds for error may only be framed in an appellant's initial brief and if addressed for the first time in the reply brief, they are waived"). Moreover, while both parties asserted breaches of the lease agreement by the other, each party sought possession of the leased premises, and the Clinic was awarded possession of the leased premises.

# Conclusion

The trial court did not err in finding the Clinic was not in default for failure to pay rent in July 2022. Moreover, the trial court did not err in concluding LR Inc. was responsible for maintenance and/or replacement of the exterior portions of the HVAC system because the lease agreement defined the Leased Premises as 6,000 square feet of interior space. However, the trial court did abuse its discretion in failing to award the Clinic attorney fees and in awarding LR Inc. attorney fees. Pursuant to the terms of the lease agreement, the Clinic was entitled to attorney fees as the "prevailing party" because it was successful on the main issue of the litigation. We accordingly affirm in part, reverse in part, and remand.

Affirmed in part, reversed in part, and remanded.

Mathias, J., and Bradford, J., concur.