**BICKNELL MINERALS, INC., Union Mines, Inc., and Parvin E. Day, Appellants (Defendants Below),**

v.

**Norma J. TILLY, Richard Brocksmith, and Doris Jane Brocksmith, Appellee (Plaintiffs Below).**

No. 26A04–9001–CV–19.

Court of Appeals of Indiana, Fourth District.

May 8, 1991.
Rehearing Denied July 10, 1991.

Daniel C. Emerson, Colleen F. McNenny, Bose McKinney & Evans, Indianapolis, Rabb Emison, Emison, Doolittle & Kolb, H. Brent Stuckey, Hart, Bell, Deem, Ewing & Stuckey, Vincennes, for appellants.

L. Edward Cummings, Kimmell, Funk & Cummings, Vincennes, for appellee.

MILLER, Judge.

This appeal involves the alleged failure to pay royalties as provided in a ten-year coal mining lease between Bicknell Minerals and Norma Tilly and Richard and Doris Brocksmith, Owners of the leased premises. When Bicknell decided to stop mining more that two years before the expiration of the Lease, it stopped paying royalties. The trial court in a summary judgment proceeding ruled in favor Owners, holding that Bicknell owed the Owners additional royalties. Bicknell now appeals, raising the following two issues:

I. Whether under the Lease Owners were entitled to minimum annual royalty payments of $150,000 after Bicknell stopped mining from the property but still remained in possession of the property; and

II. Whether Bicknell could terminate the Lease after it stopped mining the property and before the Lease expired.

We affirm.

## FACTS

On September 1, 1977, Parvin Day executed a ten year coal mining lease with

Ernest and Dora Tilly and Ernest Jr. and Norma Tilly. Day assigned his interest in the Lease to Bicknell Minerals. Norma Tilly and Richard and Doris Brocksmith (Owners), Plaintiffs-appellees, are successors in interest to the original lessors.

In 1977, the first year of the Lease, Bicknell was obligated to pay Owners $24,-000, which it did. The Lease also provided for a minimum annual royalty of $120,000 before mining commenced, and, after mining commenced, for a tonnage royalty based on the amount of coal mined from the property with a minimum annual royalty of $150,000. The Lease did not, however, specify what payments, if any, were to be made if Bicknell elected to stop mining but remained on the property.

Bicknell began mining the premises in September, 1979, and stopped mining in April, 1985. From 1979 to 1984, Bicknell paid Owners at least $150,000 in royalties each year, and with the exception of 1984, paid Owners well over the minimum $150,-000 in royalties. In 1985, Bicknell paid Owners only $132,313.71 in royalties, but elected to stop mining in April of that year. On December 29, 1986, Bicknell sent Owners a notice that "it was exercising its option to cancel the Lease", effective immediately. Bicknell, however, remained on the property until December, 1987, but did not pay Owners anything in 1986 or 1987.

In November, 1987, Owners sued Bicknell, Union Minerals (as owners of all of the stock of Bicknell) and Parvin Day, claiming that, under the Lease, Owners were entitled to at least $150,000 in royalty payments for every year the Lease remained in effect, whether or not coal was mined. Owners also claimed that Bicknell's notice of termination sent in December of 1986 was ineffective to relieve it of its obligation to pay royalties for 1986 or 1987. Therefore, they claimed Bicknell owed them $17,686.20 for 1985 (the difference between $132,313.71 which was paid and $150,000) and $150,000 for 1986 and for 1987.

On cross-motions for partial summary judgment with regard to the 1985 and 1986 royalties *only*, the Gibson Circuit Court determined that Owners were entitled to $167,686.29. (The claim for royalties for 1987 was not a part of the motions for partial summary judgment). Bicknell now appeals, arguing the trial court erred in granting summary judgment in favor of Owners.

Pursuant to Trial Rule 56(C), the court designated the following issues and claims upon which it found no genuine issue of material fact:

1. Plaintiffs are the owners of Lessor's interest in a coal mining lease dated September 1, 1977 with Plaintiff Norma J. Tilly having an undivided one half interest therein and Richard and Doris J. Brocksmith together having an undivided one half interest therein which real estate is located in Vigo Township, Knox County, Indiana.

2. The original Lessee, Parvin E. Day, assigned such lease to Bicknell Minerals, Inc. by virtue of assignment dated August 4, 1978, which assignment did not release Parvin E. Day from any obligations under the lease.

3. The coal mining lease is attached as Exhibit A to Plaintiffs' Complaint. The parties do not disagree that Exhibit A is the actual lease, and that the interests of the parties are controlled by the terms of said lease. It provides in paragraph 6 that:

"Once mining commences Lessee shall pay tonnage royalty as provided in Paragraph 7 provided; however, if the tonnage royalty paid in each year does not equal or exceed $150,000 Lessee shall pay to Lessor the difference ...".

It further provided that:

"Any such payment of difference shall be considered additional advanced royalty and shall be credited against future tonnage royalty as herein provided."

The next paragraph of the lease then proceeds to describe the method by which the Lessee is to receive credit against future tonnage royalties for these advanced royalties. This does not however, change the plain language of the Lease, to-wit, that if the tonnage

royalty does not equal or exceed $150,000.00, then the Lessee is bound to pay Lessor the difference. This is a requirement for a minimum annual payment, whether it be termed royalty or not. This Court can see no reason why somehow calling a minimum royalty payment an advanced royalty payment in order for the Lessee to receive future credit for it would free the Lessee from this obligation. The Court also notes that the Lessee drafted and prepared this document, and therefore is presumed to know the consequences of it.

4. Mining commenced on Plaintiffs' real estate in 1979.

5. Minimum payment of at least $150,000.00 per year were made to Plaintiffs through the year 1984.

6. In 1985, Plaintiffs were paid a total of $132,313.71 in coal royalties or $17,686.29 less than the agreed upon minimum amount.

7. The lease in question provided, in paragraph 9, for what are termed "mining rights". In effect, this provision gave the Lessee the rights of complete use of the property while mining in the "General Vicinity." Coal mining activities as thus defined continued to occur in the year 1986 and Defendants Bicknell Minerals, Inc. and Parvin E. Day had the use of the Plaintiffs' real estate for the year 1986 for coal mining purposes. Further, the Lessees had the right to mine coal on the premises if they so chose, and the Lessors had *no* right to mine the coal under this lease.

8. Bicknell terminated the Lease on December 30, 1986 as provided for in the Lease. This effectively ended the obligation of the Lessee to the Lessor for any future payments. This Court believes that the obligation to pay the above-described minimum royalty payment for the year 1986 had accrued to that date, however, and the termination of the Lease by the Lessees cannot act retroactively to free them of this obligation. Simply put, the Lessees had the exclusive use of the property for the entire year, including the right to mine the coal and reap whatever profit they could from mining, and the Lessor did not. To say that the Lessees could have the benefit of the use of the property for the entire year, and could exclude the Lessors from the property for the entire year, but could then preclude paying for such use by termination of the lease on the last day of their year of use, is to ignore reality.

9. Paragraph 6 of the Coal Mining Lease entitled Advance Royalties provides for a number of different types of payment from the Lessee to the Plaintiffs and the treatment of the minimum royalty payments of $150,000.00 per year as an advance royalty payment was for the benefit of the Lessee and does not diminish the rights of the Plaintiffs in the lease.

10. Plaintiffs are entitled to $17,686.29 for the year 1985 and $150,000.00 for the year 1986 pursuant to the terms of the Coal Mining Lease and such payments are owed by Defendants Bicknell Minerals, Inc. and Parvin E. Day.

## DISCUSSION AND DECISION

We begin by noting that the construction of an unambiguous written contract is generally a question of law for the court, making summary judgment particularly appropriate in contract disputes. *Ancich v. Mobil Oil Corp.* (1981), Ind.App., 422 N.E.2d 1320. If, however, a contract is ambiguous or uncertain and its meaning is to be determined by extrinsic evidence, its construction is matter for the factfinder. *First Federal Savings Bank v. Key Markets, Inc.* (1990), Ind., 559 N.E.2d 600. Rules of contract construction and extrinsic evidence may be employed in giving effect to the parties' reasonable expectations. *Id.* If the ambiguity arises because of the language used in the contract and not because of extrinsic facts, its construction is purely a question of law to be determined by the trial court. *Id.; R.R. Donnelley & Sons v. Henry–Williams, Inc.* (1981), Ind.App., 422 N.E.2d 353. When a trial court has entered summary judgment in a contract dispute, it has determined either that: 1) the contract is not ambiguous or uncertain as a

matter of law and the trial court need only apply the terms of the contract; or 2) the contract is ambiguous, but the ambiguity may be resolved without the aid of factual determinations. *Ancich, supra; Midwestern Indemnity Co. v. Leffler Const. Co.* (1984), Ind.App., 463 N.E.2d 1130. We will affirm the grant of summary judgment on any theory or basis found in the record. *Maroney v. FOP Lodge # 71* (1989), Ind. App., 546 N.E.2d 99, *reh'g denied, trans. denied.* Finally, when reviewing the trial court's interpretation of a contract, we view the contract in the same manner as the trial court. *State Security Insurance Co. v. Ottinger* (1985), Ind.App., 487 N.E.2d 446.

## I. Minimum Annual Royalty

■ Bicknell argues that the Lease did not require it to pay any royalties after mining ceased; therefore, the trial court erred in holding that the Owners were entitled to $150,000 minimum annual royalties for the years 1985 and 1986. Owners, on the other hand, argue that once Bicknell started mining on the premises, it was required to pay a minimum of $150,000 every year thereafter, even if Bicknell later stopped mining. This argument was accepted by the trial court and we agree.

In reading the contract as a whole, we find that any uncertainty here is caused by the failure to specify what would happen if Bicknell stopped mining. Further, the uncertainties arise not as a result of facts extrinsic to the document but as a result of the language employed in the contract. The primary controversy here arises over the interpretation of paragraph 6 of the Lease, dated September 1, 1977, which states:

> "ADVANCE ROYALTY: Until such time as coal is actually mined and sold from the above described land, Lessee agrees to pay Lessor *minimum annual advanced royalty* as follows:
>
> $12,000.00 on or before December 30, 1977 and payable upon approval of title;

$120,000.00 on or before one (1) year from the date hereof and each year thereafter, until mining commences.

> It is further provided that, unless this lease has otherwise been terminated Lessee shall give Lessor on or before April 1, 1978, a written commitment stating that Lessee will pay the 1st payment of $120,000.00 when same becomes due and payable on or before 1 year from the date of this lease.
>
> Once mining commences Lessee shall pay tonnage royalty as provided in paragraph 7 provided however if the tonnage royalty paid in each year does not equal or exceed $150,000.00 Lessee shall pay to Lessor the difference, before the end of each year. Any such payment of difference shall be considered ~~additional~~ *advanced royalty* and shall be credited against future tonnage royalty as herein provided.
>
> In the event the tonnage royalty paid to Lessor in any year exceeds $150,-000.00 then Lessee shall have the right to credit against the additional tonnage royalty amounts not more than 1/5th of the total advanced royalty paid to date."

(R. 6, emphasis supplied). Paragraph 7 states the manner in which tonnage royalties are to be calculated.

■ Bicknell argues that the plain language of paragraph 6 required it to pay two types of royalty payments: 1) "tonnage royalties" which were paid on the coal actually mined; and 2) "advanced royalties" which are credited against future "tonnage royalties". Once mining stopped, according to Bicknell, there could be no "tonnage royalties". Likewise, there could be no more "advanced royalties" because there would be no future tonnage royalties against which to credit the advanced royalties. Thus, the Lease does not obligate it to pay any royalties after coal is no longer mined from the premises, even though the term of the Lease had not expired and it still remained on the property.[1]

---

1. Bicknell also argues on appeal that the contract is ambiguous, in which case, the parties' intent, which Bicknell argues is a question of fact, controls the interpretation of the Lease— therefore, summary judgment should not have been granted. As Bicknell pointed out in its memorandum in support of its motion for summary judgment, when a case turns on a written document and there are cross motions for summary judgment, the construction of the written

By Bicknell's own admission, the Lease is not a model of draftsmanship. We cannot, however, agree with Bicknell's argument that under the Lease, "advanced royalties" could only occur when there is a possibility of "future tonnage royalties"—in other words, when coal would be mined in the future. This argument is based on Bicknell's assertion that paragraph 6 provides two kinds of royalty payments—1) advanced royalties to be credited against future tonnage royalties and 2) tonnage royalties. A careful reading of paragraph 6, however, reveals that *four* different types of payments are contemplated: 1) a payment of $12,000.00 payable upon approval of title; 2) *a payment of $120,000 for each year until mining commences*, called *"minimum annual advanced royalty "* in the Lease, which we will call advanced royalty No. 1; 3) tonnage royalties, calculated on the amount of coal actually mined from the premises; and 4) a second designated *"advanced royalty "*, payable after mining begins, which represents the difference between $150,000 and tonnage royalty, if tonnage royalty for any one year does not equal or exceed $150,000. We will call this advanced royalty No. 2.

Because the term "advanced royalty" is used in the Lease to refer to two very different types of payments—one to be made *before* mining starts and the other *after* mining starts—it is unclear what, if any, significance should be attached to the use of that term in either instance. However, Bicknell argues that although advanced royalty No. 1 specifically calls for a *"minimum annual advanced royalty "*, advanced royalty No. 2 does not. Thus, according to Bicknell, no such minimum payments are required under advanced royalty No. 2.

We agree that the Lease does not *specifically* state that a *minimum annual payment* of $150,000 is required once mining starts. However, the effect of the following language used in paragraph 6 is to provide for a minimum annual payment:

"Once mining commences Lessee shall pay tonnage royalty as provided in paragraph 7 provided however *if the tonnage royalty paid in each year does not equal or exceed $150,000. Lessee shall pay to Lessor the difference, before the end of each year."*

Thus, if the tonnage royalty paid to Owners in any year did not equal $150,000, Bicknell was required to pay the difference. Owners were thereby assured of at least $150,000 each year, whether or not enough coal was mined to yield $150,000 in royalties, or, for that matter, whether coal was mined at all. This language is not ambiguous—it clearly required Bicknell to pay at least $150,000 every year "once mining commences".

Bicknell also argues that the next sentence in the Lease—"[a]ny such payment of difference shall be considered ~~additional~~ advanced royalty and shall be credited against future tonnage royalty as herein provided"—indicates that the payment of royalties is dependent upon the mining of coal in the future so that there will be future tonnage royalties against which to credit the advanced royalties.[2] We observe

---

document is a question of law. *B & R Farm Services v. Farm Bureau Mutual Insurance* (1985), Ind., 483 N.E.2d 1076. *See also Southbend Escan Corp. v. Federal Insurance Co.* (N.D. Ind., 1986), 647 F.Supp. 962.

We also note a recent amendment to Ind.Trial Rule 56, which states, in relevant part:

(H) Appeal–Reversal. No judgment rendered on the motion [for summary judgment] shall be reversed on the ground that there is a genuine issue of material fact unless the material fact and the evidence relevant thereto shall have been specifically designated to the trial court.

This rule did not become effective until January 1, 1991; therefore, it does not control in this appeal. However, it has long been the rule that

failure to raise an issue to the trial court results in waiver of that issue on appeal. Accordingly, we will confine our discussion to whether the trial court erred, as a matter of law, in granting summary judgment in favor of Owners.

2. Both parties would agree that Bicknell is entitled to credit any "advanced royalties" paid against future tonnage royalties. Thus, if, for example, Bicknell mined enough coal in 1980 to yield only $100,000 in tonnage royalties, it would still have to pay Owners $150,000, and the $50,000 would be considered advanced royalties. If, in any subsequent year, tonnage royalties exceeded $150,000, Bicknell would be entitled to credit the advanced royalties against the amount over $150,000 paid in that year, as provided in paragraph 6.

that if the payment of the $150,000 was dependent on whether or not there would be mining in the future, Bicknell would not have to make the minimum payment in the last year of the Lease if it continued mining until the last year. However, there is no provision in the Lease which relieves Bicknell of the minimum royalty in the last year of the Lease. Nor is there a provision that relieves it of paying the minimum royalty once it has stopped mining and remains on the property. Rather, this provision merely allows Bicknell a credit against future tonnage royalties—if there are any—for any advanced royalties paid. Bicknell also retained the right to mine again in 1987 in order to recover its 1986 advanced royalties.

 Bicknell further argues that requiring a minimum payment of $150,000 a year, whether or not coal is mined, would be changing the word "royalty"—which is in the Lease—to "rent"—which is not. However, the use of the word "royalty" instead of "rent" is not dispositive. "Royalty" is defined as:

"... share of product or profit reserved by owner for permitting another to use the property.... In mining and oil operations, a share of the product or profit paid to the owner of the property."

Black's Law Dictionary 1195 (5th ed. 1986), citing *Alamo National Bank of San Antonio v. Hurd* (1972), Tex.Civ.App., 485 S.W.2d 335, 338; *Marias River Syndicate v. Big West Oil Co.* (1934), 98 Mont. 254, 38 P.2d 599, 601. Thus, the term royalty is more appropriately used when the amount to be paid to the owners of the property is calculated on the amount of coal actually mined, and "rent" is a more appropriate term when the amount paid for the use of the property is a fixed amount, not dependent on the amount of coal mined. However, in coal mining leases, the terms "rent" and "royalty" are often used interchangeably to convey the same meaning:

"The terms "rent" and "royalty," as a result of usage and custom, are frequently, although not technically or accurately, employed interchangeably in mining leases to convey the same meaning, and ordinarily the "royalties" in the case of such leases constitute rent; but "royalty" is the more appropriate term where rental is based on the quantity of coal or other mineral that is or may be taken from a mine ...".

58 C.J.S. *Mines and Minerals* § 185 (1948). Further, though "rent" would be a more appropriate term to use, mining leases often provide a "minimum royalty" which is paid to the owner even though no mining is done or the royalty at the agreed rate on what is actually mined is less than the minimum. *Id.* at § 186. *See also Anderson v. United Coal & Coke* (1951), 67 Wyo. 536, 227 P.2d 700.

The Lease in this case, not unlike other coal mining leases, uses the word "royalty" to mean both "rent" and "royalty". Here, the Lease required $120,000 to be paid each year until mining commenced. Though called an advanced royalty in the Lease, this amount is not a "royalty" at all because it is not connected in any way to the amount of coal actually mined. In fact, the provision clearly contemplates a period of time when no mining at all will be taking place. Thus, this $120,000 "royalty" is "rent" because it is a fixed amount and is not dependant on coal actually mined.

 There were several well-settled rules of contract interpretation which assisted the trial court in reaching its conclusion. First, the court should attempt to determine the intent of the parties at the time the contract was made as discovered by the language used to express their rights and duties. *Sink & Edwards Inc. v. Huber, Hunt & Nichols* (1984), Ind.App., 458 N.E.2d 291. The contract must be read as a whole when trying to ascertain the intent of the parties. *Kruse, Kruse & Miklosko, Inc. v. Beedy* (1976), 170 Ind.App. 373, 353 N.E.2d 514. Finally, any ambiguity in the contract is to be construed against the drafting party—in this case Bicknell. *Reith–Riley Construction Co. v. Auto–Owners Mutual Insurance* (1980), Ind.App., 408 N.E.2d 640.

The primary purpose of the Lease was to permit Bicknell to prospect and to mine coal. However, it also permitted Bicknell

to conduct pre-mining activities on the premises and to use the leased premises while conducting mining activities anywhere within a three mile radius of the leased premises. Thus, pursuant to the Lease, the premises could be used for three distinct activities: 1) pre-mining activities, such as prospecting; 2) mining; and 3) using the property in its mining of other premises.[3] However, paragraph 6 specifically provides for payment in two situations: 1) before mining begins; and 2) after mining begins. This paragraph does not say what, if anything, is to be paid once mining ·has stopped and Bicknell remains on the property for the remaining term of the Lease, exercising its right to use the property in its mining of surrounding properties.

■▬▬ The failure to provide a separate payment once Bicknell has stopped mining and remains on the property could mean either that the parties intended that *no* payments would be made if Bicknell stopped mining before the Lease expired; or it could mean that Bicknell was required to continue to pay Owners at least $150,000 every year until the Lease expired—whether or not it was actually mining coal for the entire time. The first possibility would be to Bicknell's benefit. However, because Bicknell drafted the Lease, it must be strictly construed against Bicknell. *Reith–Riley Construction Co., supra.* Thus, we find that the Lease must be taken to mean

that Bicknell was required to pay at least $150,000 every year until the Lease expired. The Lease clearly stated that Bicknell was to pay Owners a minimum of $150,000 a year *once mining commenced.* Mining commenced in 1979 and Bicknell is required under the Lease to pay Owners at least $150,000 a year for every year after mining commenced.

Bicknell also argues that it could exercise its right under paragraph 9 of the Lease—to use the property in its mining of surrounding areas—without having to pay Owners. However, paragraph 9 begins "[f]or the consideration aforesaid ...". (*See* footnote 3 for full text of paragraph). Thus, the Lease clearly required Bicknell to compensate Onwers if it exercised its rights under paragraph 9, whether or not it mined the premises.

## II. Whether Bicknell could terminate the Lease after it started mining the property.

On December 29, 1986, Bicknell sent Owners a notice it was terminating the Lease. Bicknell did not mine any coal from the leased premises that year, but used the property in its mining of coal from surrounding areas and to conduct mine reclamation on the leased premises. However, Bicknell did not pay Owners anything in 1986, maintaining instead that the termination provision permitted it terminate the

3. Paragraph 9 of the Lease provides as follows: MINING RIGHTS: For the consideration aforesaid, Lessors hereby grant and convey to the Lessee an easement, to continue in force during the term of this lease and so long thereafter as Lessee is mining, handling, or transporting coal within the General Vicinity of the leased premises to use said leased premises in the conduct of Lessee's operations before, during and after the removal of coal from the leased premises, including the right to construct, use, maintain on and remove from the leased premises buildings, structures, roads, railroads, transmission lines, conveyors, pipelines, pumping stations, reservoirs, settling ponds and other facilities, and to make excavations, pits, ditches, drains, dams, stockpiles, dumps and to deposit dirt, overburden and refuse on the leased premises, and to do any and all other things incidental to or connected with Lessee's operations in the mining, transportation, preparation and

marketing of coal from the leased premises and from other coal lands in the General Vicinity thereof including, without limitation, the right to transport men, material, supplies, equipment and other coal from lands in the General Vicinity of the leased premises over and across the leased premises, all without liability for damage to the leased premises caused thereby.... (As used in this Lease, the term "General Vicinity" shall mean an area surrounding the leased premises having a radius of three miles).
 Paragraph 10 gave Bicknell a right to ingress and egress on the premises which was to continue after the term of the Lease to comply with Federal, State, and Local laws relating to coal mining and land reclamation. However, Bicknell admitted that it was exercising its rights under paragraph 9—to use the leased premises in its mining of other property—as well as its rights under paragraph 15—to conduct mine reclamation until June, 1987.

Lease at any time before the Lease expired without paying Owners any advanced royalties for the year in which it terminated the Lease.

Owners, on the other, hand argue that the termination provision did not relieve Bicknell of its obligation to pay Owners $150,000 in 1986. We find, however, that the termination provision did not permit Bicknell to terminate the Lease once it started mining from the premises.[4]

■ Paragraph 3 of the Lease provides as follows:

"3. OPTION TO TERMINATE: The Lessee herein shall have the option to proceed under the terms of this lease from year to year by paying the *advance royalty as provided in paragraph 6 herein* or terminate the lease and file a release in the Recorder's Office of Knox County, Indiana."

(R. 6, emphasis supplied).

As already noted, paragraph 6 provides two very different types of royalties, which we call advanced royalty No. 1 (the $120,000 minimum payment due each year until mining commences) and advanced royalty No. 2 (the difference between $150,000 and tonnage royalty, if tonnage royalty for any one year does not equal or exceed $150,000). However, Paragraph 3 refers only to "advance royalty" and does not make a distinction between the two different royalties. Thus, the question is whether paragraph 3 refers to either advanced royalty No. 1, to advanced royalty No. 2, or to both. We conclude that paragraph 3 refers to advanced royalty No. 1. Thus, Bicknell could terminate the Lease only before mining commenced—at a time when it was obligated to pay advanced royalty No. 1.

We first look to the placement of the termination provision in the Lease. It is placed in the preliminary provisions of the Lease. Paragraph 1 describes the leased premises, paragraph 2 permits Bicknell to test drill on the premises until December 30, 1977, and paragraph 4 permits Bicknell right of ingress and egress to explore and test the premises. These activities would occur before mining started. Thus, the placement of the termination provision indicates that it was intended as a provision to be operable before mining started.

Secondly, the only mention of an option to terminate is with respect to advanced royalty No. 1. Paragraph 6 provides in part:

"*ADVANCE ROYALTY:* Until such time as coal is actually mined and sold from the above described land, Lessee agrees to pay Lessor minimum annual advanced royalty as follows:

$12,000.00 on or before December 30, 1977 and payable upon approval of title; $120,000.00 on or before one (1) year from the date hereof and each year thereafter, until mining commences.

It is further provided that, *unless this lease has otherwise been terminated* Lessee shall give Lessor on or before April 1, 1978, a written commitment stating that Lessee will pay the 1st payment of $120,000.00 when same becomes due and payable on or before 1 year from the date of this lease."

This is the only mention in the Lease of the possibility that the Lease might be terminated.

■ We also observe that under paragraph 6, Bicknell was obligated to pay advanced royalty No. 1 *every year* until mining started. Therefore, Bicknell was definitely obligated to pay this royalty until mining started. On the other hand, Bicknell was obligated to pay advanced royalty No. 2 only if tonnage royalties in a year did not amount to $150,000—a condition which

---

**4.** Here, the trial court concluded that:
Bicknell terminated the Lease on December 30, 1986 as provided for in the Lease. This effectively ended the obligation of the Lessee to the Lessor for any future payments....
(R. 168 finding No. 8).
Although we disagree with this particular conclusion, we find that the ultimate decision of the trial court was correct. Even though the rea-

sons given by the trial court do not coincide with our reasons, we are nevertheless bound to affirm the decision of the trial court if the correct result was reached by the trial court. *Hurst v. Board of Commissioners of Pulaski County* (1985), Ind., 476 N.E.2d 832; *First Bank of Madison v. Bank of Versailles* (1983), Ind. App., 451 N.E.2d 79.

may or may not have occurred in any given year of mining. In fact, from 1979 to 1983, Bicknell paid Owners more than the minimum $150,000 royalty payment, indicating that no advanced royalties were paid in those years. Thus, if paragraph 3 referred to advanced royalty No. 2—as Bicknell argues—termination could only occur in a year in which an advanced royalty payment No. 2 would be required, i.e., when tonnage royalties did not equal or exceed $150,000. This is an absurd result which would render the termination option virtually meaningless because in those years that no advanced royalty No. 2 would be paid, Bicknell would not have an *option* to terminate. This court will make all attempts to construe the language in a contract so as not to render any words, phrases, or terms ineffective or meaningless. *Holtzclaw v. Bankers Mutual Insurance Co.* (1983), Ind.App., 448 N.E.2d 55. The only way to make this *option* to terminate effective is to interpret it to mean that Bicknell could terminate the Lease in those years it was still paying advanced royalty No. 1—that is, before mining commenced.

Finally, paragraph 6 provides that once mining commences, if tonnage royalty paid in a particular year does not equal or exceed $150,000, Bicknell *shall* pay Owners the difference between tonnage royalties and $150,000 (advanced royalty No. 2). To conclude that Bicknell could either pay this difference *or* terminate the Lease before the end of the year—without paying the difference and or the accrued tonnage royalties for the year—would be to ignore the obligatory language of paragraph 6.

■ We must accept an interpretation of the contract which harmonizes its provisions as opposed to one which causes the provisions to be conflicting. *First Federal Savings Bank of Indiana, supra.* Here, the only way to harmonize the option to terminate contained in paragraph 3 is to conclude that Bicknell could only exercise the option *before* mining commenced on the property. Its attempt to terminate the contract by sending Owners notice of termination in December of 1986 is therefore ineffective to relieve Bicknell of its obli-

gations under the Lease. Thus, Bicknell is required pay Owners $150,000 for 1986.

The decision of the trial court is hereby affirmed.

BUCHANAN, J., concurs.

CHEZEM, J. concurs in result.