IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 6, 2017 Session

FILED
JAN 26 2018
Clerk of the Appellate Courts
Rec'd By _____

## OPRY MILLS MALL LIMITED PARTNERSHIP, ET AL. v. ARCH INSURANCE COMPANY, ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 10-1504-IV      Russell T. Perkins, Chancellor**

### No. M2016-01763-COA-R3-CV

The primary claim at issue in this appeal is for breach of an insurance contract. The insured property at issue, Opry Mills Shopping Mall, sustained catastrophic damages from the May 2010 flood in Nashville, Tennessee. Following the flood, the insureds contended the policy provided $200 million of coverage. The insurers insisted the policy limit for the claim was $50 million pursuant to the High Hazard Flood Zones Limit due to the fact the location of the Mall had been designated on a Flood Insurance Rate Map as a Special Flood Hazard Area. The trial court summarily ruled that the policy limits were $200 million finding, *inter alia*, the insured properties that were limited to $50 million of coverage were listed on the High Hazard Flood Locations schedule in Endorsement 6 of the policy, and Opry Mills Shopping Mall was not listed. Therefore, the trial court ruled that the policy limits for the claim were $200 million. Following a lengthy trial, the jury awarded the insured a judgment of almost $200 million. The insurers appealed. We have determined the policy limits are $50 million. Because the insurers paid the insureds $50 million before the commencement of this action, which is all the insurers are obligated to pay on the claim, the judgment of the trial court is reversed. We have also determined that the trial court did not err by summarily dismissing the insureds' alternative claim that was based on promissory estoppel.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J. and RICHARD H. DINKINS, J., joined.

William L. Harbison, Phillip F. Cramer, and Lauren Z. Curry, Nashville, Tennessee, and Peter E. Kanaris and David E. Heiss, Chicago, Illinois for the appellants Arch Insurance Company; Aspen Insurance UK Ltd.; General Security Indemnity Company of Arizona Hiscox Inc., Ironshore Specialty Insurance Company; Lexington Insurance Co.; Liberty

Mutual Fire Insurance Company; Certain Underwriters at Lloyds of London; Maiden Specialty Insurance Co.; RSUI Indemnity Company; Sompo Japan Insurance Company of America; Tokio Marine & Nichido Fire Insurance Co., Ltd. (U.S. Branch); Torus Specialty Insurance Co.; and XL Insurance America, Inc.

Byron R. Trauger, Paul W. Ambrosius, Nashville, Tennessee, and J. Randolph Evans, and Anthony W. Morris, Atlanta, Georgia, attorneys for appellant Zurich American Insurance Company.

Donald Capparella and Gregory L. Cashion, Nashville, Tennessee, and Andrew J. Detherage and Charles P. Edwards, Indianapolis, Indiana, for the appellees Simon Property Group L.P. and Opry Mills Mall Limited Partnership.

## OPINION

Simon Property Group, L.P. ("Simon") is a real estate conglomerate that owns hundreds of real estate ventures and commercial properties.[1] One of the real estate ventures Simon owned during the period relevant to this appeal was Opry Mills Mall Limited Partnership ("Opry Mills"), which owns Opry Mills Shopping Mall ("the Mall") in Nashville, Tennessee.[2]

At all times relevant to this appeal, Simon, its ventures and properties were insured under a global unscheduled insurance policy ("the Policy"). At the time of the May 2010 flood at issue, the Mall was insured under the Policy which afforded a maximum aggregate of coverage of one billion dollars. The risk of loss was shared by numerous insurance companies that collectively agreed to underwrite the Policy based on percentages of liability in layers of coverage. This appeal involves two layers of coverage between $50 million and $200 million.

---

[1] In the defendants/appellees' brief, they state that Simon is the world's largest retail real estate investment trust. As of the 2010 flood, Simon was "a $60 billion publicly-traded S&P 500 company that own[ed] and manage[d] hundreds of real estate holdings located throughout the world." They go on to state: "Today, Simon's market capitalization exceeds $100 billion and it owns or has an interest in 387 properties, comprising 263 million square feet of lease area."

[2] As Simon and Opry Mills note in their brief, Opry Mills Mall Limited Partnership was acquired in 2007 by a joint venture between Simon and Farallon Capital Management. The appellees go on to state that Opry Mills Mall Limited Partnership "was not a subsidiary of Simon at the time the Mall was acquired. Simon, through affiliated special purpose entities, owned a 50% interest in SPG-FCM Venture, LLC, a Delaware limited liability company which is the joint venture company that acquired The Mills Corporation and all of its assets, including the Opry Mills Shopping Mall, in 2007." Although it is not germane to the issues on appeal, it appears that Simon was the sole or majority owner of Opry Mills Mall Limited Partnership at the time of the flood in 2010 that gave rise to the claim at issue.

This action arises from one of the worst floods in Nashville's history which submerged the Mall in up to 10 feet of water. The flood resulted from a record amount of rain that fell on May 1 and 2, 2010, from a slow moving weather system. Several rainfall records in the area were broken, and the Cumberland River, which is adjacent to the Mall, crested at over 51 feet in Nashville, exceeding a level not experienced since 1937.

When the Mall parking lot became submerged under water, the decision was made to close the Mall on Sunday, May 2. The following day, the entire Mall was completely submerged, and it remained closed for months.[3] Immediately thereafter, the parties agreed to engage Crawford & Company ("Crawford") to serve as the claim adjuster, and Crawford was on the ground as soon as the property became accessible. When Crawford representatives first accessed the property on May 5, the flood water had not yet receded. By the next day, the water had receded and Crawford representatives were able to observe the damage. Thereafter, Crawford representatives participated in daily meetings with contractors hired by Simon to remediate the damage. These meetings involved what work was to be done and how it was to be done.

After Crawford reviewed the insured location, the flood conditions, and the Policy, it reached the conclusion that the Mall was located in a High Hazard Flood Zone, as that term was defined in the Policy, for which the limit of coverage was $50 million. Based on this and Crawford's determination that the compensable damages would exceed $50 million, on July 20, 2010, Crawford recommended that the insurers pay the $50 million High Hazard Flood Zones Limit. Soon thereafter, the insurers remitted $50 million to the insureds. On July 30, 2010, the insurers formally notified Simon and Opry Mills that they were denying coverage for any amount in excess of $50 million.

On September 14, 2010, Simon and Opry Mills ("Plaintiffs"), commenced this action in which they asserted claims against fifteen insurance companies that participated on a prorate basis in providing layers of coverage between $50 million and $200 million ("Defendants").[4] The insurance companies that participated in the first $50 million of

---

[3] Most of the Mall remained closed until March 29, 2012, although a few tenants opened sooner. For example, anchor tenant Bass Pro Shop opened on September 15, 2010, - just four months after the flood - with other large tenants following suit.

[4] For the layer of coverage between $50 million and $100 million, the excess insurers (along with their percentage of participation) are: XL Ins. Am. Inc. 10%, Arch Ins. Co. 5%, Zurich Am. Ins. Co. 10%, Tokio Marine & Nichido Fire Ins. Co., Ltd. 5%, Lloyds Kiln Syn. No. 510 (Kiln Underwriting Ltd. and Chaucer Syn. No. 1084 (Chaucer Corporate Capital No. 2 Ltd.)) 5%, Lloyds Syn. No. 3624 (Hiscox Inc.) 7.5%, Ironshore Speciality Ins. Co. 5%, RSUI Indem. Co. 10%, Lloyds Syn. No. 033 (Hiscox) 7.5%, Lexington (SCOR/China Re) 10%, Liberty Mutual Fire Ins. Co. 5%, Essex Ins. Co. 5%.

For the layer of coverage between $100 million and $200 million, the excess insurers (along with their percentage of participation) are: XL Ins. Am. Inc. 10%, Arch Ins. Co. 5%, Zurich Am. Ins. Co. 20%,

(continued...)

- 3 -

coverage are not involved in this appeal because that sum was paid prior to the commencement of this action.

The complaint asserted numerous alternative claims but only two are relevant in this appeal. The complaint asserted a claim for breach of contract for the wrongful denial of coverage in excess of $50 million. The complaint also asserted an alternative claim of promissory estoppel, which is premised on the allegation that Defendants made pre-flood representations that the Mall had $200 million in flood coverage.[5]

Following discovery, the parties filed various motions on numerous issues including motions for partial summary judgment. Plaintiffs filed a motion for partial summary judgment contending the Policy provided $200 million of coverage because the $50 million **High Hazard Flood Zones** coverage limitation did not apply due to the fact the Mall was not one of the locations identified under Endorsement 6 as one of the **High Hazard Flood Locations**.[6] Defendants filed a joint motion for partial summary judgment

---

Tokio Marine & Nichido Fire Ins. Co., Ltd. 10%, Maiden Specialty Ins. Co. 5%, Gen. Sec. Indem. Co. of Az. 5%, Lloyds Kiln Syn. No. 510 (Kiln Underwriting Ltd. and Chaucer Syn. No. 1084 (Chaucer Corporate Capital No. 2 Ltd.)) 2.5%, Ironshore Speciality Ins. Co. 2.5%, Torus Spec. Ins. Co. 5%, Sompo Japan Ins. of Am. 25%, Aspen Ins. UK Ltd. 5%, RSUI Indem. Co. 5%.

[5] Plaintiffs amended their complaint several times and the operative complaint in this case is the Third Amended Complaint filed on September 19, 2011. The complaint, as amended, asserted claims of breach of contract, estoppel, declaratory judgment, bad faith, and violation of the Tennessee Consumer Protection Act ("TCPA"). It also asserted alternative claims of promissory estoppel and negligence.

[6] **High Hazard Flood Locations** and **High Hazard Flood Zones** are defined terms within the Policy and they are always printed in bold font. The **High Hazard Flood Locations** listed in Endorsement 6 are:

        Chicago Premium Outlets, Aurora, IL
        Coconut Point, Estero, FL
        Coral Square, Coral Springs, FL
        Crystal River, Crystal River, FL
        Dadeland Mall, Miami, FL
        Dare Center, Kill Devils Hill, NC
        Desoto Square Mall, Bradenton, FL
        Gulf View Square, Port Richey, FL
        Miami International, Miami, FL
        Newport Centre, Jersey City, NJ
        Newport Crossing, Jersey City, NJ
        Newport Plaza, Jersey City, NJ
        Paddock Mall Off-site Storage, Ocala, FL
        Petaluma Village Premium Outlets, Petaluma, CA
        The Esplanade, Kenner, LA
        Washington Square Mall, Indianapolis, IN

contending the $50 million limitation of coverage applied because the Mall was located in a **High Hazard Flood Zone** as that term is defined in the Policy. Defendants also contended that the listing of **High Hazard Flood Locations** in Schedule 6 applied only to "the deductibles section" of the Policy, not to the limitation of coverage.

The trial court held a hearing on February 11, 2015, on the cross motions for summary judgment related to the Policy limits and held hearings on March 3 and 4, 2015, on the remaining motions. The trial court issued an order and memorandum on March 13, 2015, in which it stated that it was applying the traditional Tennessee summary judgment standard because the case was filed before the standard in Tenn. Code Ann. § 20-16-101 became law. The court also stated that because the Policy did not contain a choice of law provision and because the Policy was delivered to Simon whose principal office was in Indiana, the court was applying Indiana law to interpret the Policy.

As stated in the order entered on March 13, 2015, the trial court granted Plaintiffs' motion for partial summary judgment and denied Defendants' cross motion on the limits of coverage. Applying Indiana law to interpret the Policy, the trial court found that the $200 million limitation applied. The court stated in pertinent part "that a mall situated in a High Hazard Flood Zone had to be listed as a High Hazard Flood Location to be Subject to the $50 Million Sublimit." Further, the court "discern[ed] no ambiguity in the parties providing a list of malls which are 'High Hazard Flood Locations' immediately below a broader definition of 'High Hazard Flood Zones,' and the undisputed fact that Opry Mills Mall was not on the list in 2010." The trial court granted summary judgment to Defendants on the estoppel, TCPA, and bad faith claims.

The case then proceeded to trial before a jury. Plaintiffs introduced evidence that they incurred expenses and business losses as a result of the flood that included, *inter alia*, $55 million for remediation expenses, $93.4 million in replacement costs, and $41 million in lost income during the shutdown of Opry Mills. Defendants challenged the damages claimed by Plaintiffs on numerous grounds. The jury returned a verdict in favor of Plaintiffs, finding damages in the following amounts on Plaintiffs' breach of contract claims under the Policy:

| | |
|---|---|
| Remediation Costs: | $ 55,060,642 |
| Replacement Costs: | $ 89,350,351 |
| Business Interruption Losses: | $ 41,945,081 |
| Consequential Damages: | $ 16,831,605 |
| Loss Adjustment Expenses: | $ 936,137 |

The total award of damages, including additional consequential damages, was $204,123,816. After giving Defendants a credit for the $50 million paid on the claim prior to the commencement of this action and "[a]fter deductions for the deductible and participation by insurers who were not Defendants," the trial court apportioned the

covered damages among Defendants, that being the insurers that participated in this action. Pursuant to the Order on Jury's Verdict entered on November 5, 2015, Plaintiffs were awarded a judgment of $146,373,816 against the insurers that are Defendants in proportionate amounts as specified in the order. On April 11, 2016, the trial court entered a final judgment of $146,373,816 in favor of Plaintiffs and additionally awarded Plaintiffs $373,535.28 in discretionary costs. The judgment additionally stated that Plaintiffs were not entitled to recover prejudgment interest.

Defendants subsequently filed motions for a new trial and for judgment notwithstanding the verdict. The trial court denied these motions. Defendants then timely appealed.

## ISSUES

The primary issue presented for our review is whether the applicable limit of coverage for flood damage is $50 million or $200 million. If we rule that the $200 million limit applies, Defendants want us to additionally review the trial court's other rulings including its exclusion of evidence, its directed verdict rulings, certain jury instructions, the verdict form, and the trial court's denial of Defendants' motions for a new trial and judgment notwithstanding the verdict.[7] Conversely, if we rule that the $50 million limit applies, Defendants' state that their additional issues are moot.

As for the issues raised by Plaintiffs, if we rule that the $200 million limit applies Plaintiffs want us to determine if they are entitled to recover prejudgment interest. Conversely, if we rule that the $50 million limit applies, Plaintiffs want us to determine whether reinstatement of their alternative claim of estoppel is required.[8]

## ANALYSIS

### I. INTERPRETATION OF THE POLICY

The primary contentions of the parties on this issue, that being the limit of coverage for flood damage, can be summarized as follows.

Defendants contend the facts that are most relevant to this issue can be summarized in three sentences:

---

[7] A complete statement of the issues presented for our review by Defendants can be found at 2017 WL 2691709, at *48 (the issues are set forth on page 1 of the brief; however, they appear on page 48 on Westlaw).

[8] A complete statement of the issues presented for our review by Plaintiffs can be found at 2017 WL 4707981, at *xiv – xvi.

First, the Simon Policy provides $50 million of coverage for floods in high hazard flood zones as defined by the applicable government flood map. Second, at the time of the May 2010 flood, the applicable government flood map reflects Opry Mills being situated in a high hazard flood zone. Thus . . . this entire appeal may be resolved through application of the plain language of the Simon Policy and the FEMA-designated location of Opry Mills.

(Internal citations to the record omitted).

Plaintiffs contend the policies that have insured Simon, its ventures and properties since Opry Mills and the Mall were acquired in 2007, have always listed the locations which only have $50 million in flood coverage under "High Hazard Flood Locations." They also rely on the fact the Mall has never appeared on that list.[9]

Applying Indiana Law, the trial court found that the $200 million limitation applied. Specifically, the court stated "that a mall situated in a High Hazard Flood Zone had to be listed as a High Hazard Flood Location to be Subject to the $50 Million Sublimit." We respectfully disagree.

The interpretation of an insurance policy is a question of law for the court and is thus reviewed de novo. *State Farm Mut. Auto. Ins. Co. v. Jakubowicz*, 56 N.E.3d 617, 619 (Ind. 2016). When interpreting insurance contracts, we are to construe them in the same manner as any other contract. *Allstate Ins. Co. v. Dana Corp.*, 759 N.E.2d 1049, 1054 (Ind. 2001). Courts cannot ignore the plain words of an insurance contract and are to "make all attempts to construe the language in a contract so as not to render any words, phrases, or terms ineffective or meaningless." *American Family Life Assur. Co. v. Russell*, 700 N.E.2d 1174, 1177 (Ind. Ct. App. 1998) (citing *Farthing v. Life Ins. Co. of N. America*, 500 N.E.2d 767, 772 (Ind. Ct. App. 1986) and *Bicknell Minerals, Inc. v. Tilly*, 570 N.E.2d 1307, 1316 (Ind. Ct. App. 1991)).

Furthermore, a policy "must be reasonably construed, and the court may not find coverage unless the language of the policy admits liability." *Gallant Ins. Co. v. Allstate Ins. Co.*, 723 N.E.2d 452, 455 (Ind. Ct. App. 2000) (citing *Allstate Co. v. Kepchar*, 592 N.E.2d 694, 696 (Ind. Ct. App. 1992)). "[E]xceptions, limitations and exclusions must be plainly expressed in the policy." *American Family Life Assur. Co.*, 700 N.E.2d at 1177.

---

[9] Plaintiffs also argue that regardless of this court's interpretation, Opry Mills was built two feet above the flood plain and therefore, not subject to the limitation. However, the trial court ruled that Plaintiffs' waived this argument because Plaintiffs did not plead it in their Third Amended Complaint. We agree.

"However, if the language of the policy is ambiguous, then the court may apply the rules of construction in interpreting the language." *Askren Hub States Pest Control Services, Inc. v. Zurich Ins. Co.*, 721 N.E.2d 270, 275 (Ind. Ct. App. 1999) (citing *Eli Lilly and Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind. 1985)). In determining whether an ambiguity exists and if so, how courts are to interpret that ambiguity, Indiana courts have previously stated:

> An ambiguity does not arise merely because the two parties proffer differing interpretations of the policy language. *Lexington Ins. v. American Healthcare Providers*, 621 N.E.2d 332, 336 (Ind.Ct.App.1993), *trans. denied*. Rather, the policy is ambiguous only if it is "susceptible to more then [sic] one interpretation and reasonably intelligent persons would differ as to its meaning." *Commercial Union Ins. v. Moore*, 663 N.E.2d 179, 181 (Ind.Ct.App.1996), *trans. denied. See Masonic Accident Ins. Co. v. Jackson*, 200 Ind. 472, 481, 164 N.E. 628, 631 (1929). If there is an ambiguity, an insurance contract should be interpreted in the light most favorable to the insured. *Eli Lilly*, 482 N.E.2d at 470. The contract should be construed to further its basic purpose of indemnity.

*Id.*

As we begin our analysis of the policy limits issue, it is important to understand the significance of certain terms that are used in the Policy. Two important terms, which are defined in the Policy, are: "**High Hazard Flood Zones**" and "**High Hazard Flood Locations**." Two other important terms that appear in the Policy are the "National Flood Insurance Program" and "Special Flood Hazard Area."

Except for floods that occur in **High Hazard Flood Zones**, the Policy provides coverage up to $200 million. Defendants rely on Clause 3 of the Policy to insist that the $50 million limit applies to the claim at issue. Clause 3, which pertains to coverage for damage resulting from a flood, reads in pertinent part:

**3.    Limits of Liability**

> In the event of loss or damage insured under this policy, this **Insurer** shall be liable for its proportional share of $1,000,000,000 per **occurrence** except as respecting the following, excess of the policy deductibles:

> • • •

> $200,000,000 per **occurrence** and in the aggregate in any one policy year as respects losses caused by **flood** except;

- 8 -

$50,000,000 per **occurrence** and in the aggregate in any one policy year as respects losses caused by flood in **High Hazard Flood Zones**. (High Hazard Zones are within the 100 Year Flood plane or equivalent).

(Bold in original).

The term **High Hazard Flood Zones** is defined in Endorsement 6 to the Policy as:

a) all property at a "location" that is partially or totally situated in an area which at the time of loss or damage has been designated on a Flood Insurance Rate Map (FIRM) to be a Special Flood Hazard Area (SFHA), and/or

b) all property in areas where the National Flood Insurance Program (NFIP) is not in effect, and where all property at a "location" is partially or totally situated in an area which is within a 100 year flood plain or its worldwide equivalent.

Special Flood Hazard Area (SFHA): The areas of a Flood Insurance Rate Map (FIRM) identified as Zone(s): A . . . AE. . . .[10]

It is undisputed that Flood Zone "AE" is identified in the Policy as a Special Flood Hazard Area as designated on the Flood Insurance Rate Map. Moreover, the trial court correctly found that the Mall was located in a **High Hazard Flood Zone**. Therefore, Defendants insist that the $50 million **High Hazard Flood Zones** limit applies.

Plaintiffs counter this argument by contending that Clause 3 of the Policy must be read in conjunction with Endorsement 6 to the Policy which defines **High Hazard Flood Zones** and directly below that definition states:

**HIGH HAZARD FLOOD LOCATIONS** are defined as follows:

Chicago Premium Outlets, Aurora, IL
Coconut Point, Estero, FL
Coral Square, Coral Springs, FL
Crystal River, Crystal River, FL
Dadeland Mall, Miami, FL

_____

[10] This definition appears in Endorsement 6 – AMENDATORY ENDORSEMENT – DEFINITIONS.

- 9 -

Dare Center, Kill Devils Hill, NC
Desoto Square Mall, Bradenton, FL
Gulf View Square, Port Richey, FL
Miami International, Miami, FL
Newport Centre, Jersey City, NJ
Newport Crossing, Jersey City, NJ
Newport Plaza, Jersey City, NJ
Paddock Mall Off-site Storage, Ocala, FL
Petaluma Village Premium Outlets, Petaluma, CA
The Esplanade, Kenner, LA
Washington Square Mall, Indianapolis, IN

Based on Endorsement 6, Plaintiffs contend the $50 million limitation was only applicable to the "locations" listed under **High Hazard Flood Locations**. Defendants respond by insisting that the **High Hazard Flood Locations** identified on Schedule 6 above applied only to the deductibles section of the Policy. They emphasize this point by noting that Endorsement 6 is the only other place this term is found in the Policy. Moreover, Defendants note that this portion of the Policy, which applies to the deductible, not coverage, reads as follows:

4.      Deductible

• • •

E.      In the event of property damage and/or time element loss as respect **flood** occurring in **High Hazard Flood Locations**, the sum to be deducted shall be the greater of $500,000 per **occurrence** or the amount collectible under the National Flood Insurance Program.

For these reasons, Defendants contend the list of locations in Schedule 6 as **High Hazard Flood Locations** applied only to a higher deductible and the listing has no application to the limits of coverage provided in the event of a flood.

In its ruling on this issue the trial court stated that it "discern[ed] no ambiguity in the parties providing a list of malls which are 'High Hazard Flood Locations' immediately below a broader definition of 'High Hazard Flood Zones,' and the undisputed fact that Opry Mills Mall was not on the list in 2010." We agree that there is no ambiguity and that the *definitions* of these terms are in close proximity to each other; however, we disagree with the emphasis the trial court placed on that proximity.

We find it significant that the only place the defined term **High Hazard Flood Locations** is applied in the Policy is in a section of the Policy that only pertains to the

- 10 -

amount of the *deductible*, not the limit of *coverage*. The only place the term is applied is in paragraph 4 of the Policy, which reads as follows:

4.      Deductible

. . .

E.      In the event of property damage and/or time element loss as respect **flood** occurring in **High Hazard Flood Locations**, the sum to be deducted shall be the greater of $500,000 per **occurrence** or the amount collectible under the National Flood Insurance Program.

Thus, the fact that the Mall is not one of the locations listed in Endorsement 6 to the Policy is not relevant when considering the amount of coverage under the Policy. What is relevant and controlling is Clause 3 of the Policy that pertains to the amount of coverage in the event of a flood.

Clause 3 expressly states under the heading "**Limits of Liability**" that the aggregate amount of coverage is $50,000,000 per occurrence "as respects losses caused by flood in **High Hazard Flood Zones**." The Limits of Liability section goes on to provide that the term **High Hazard Flood Zones** is defined as: "all property at a 'location' that is partially or totally situated in an area which at the time of loss or damage has been designated on a Flood Insurance Rate Map (FIRM) to be a Special Flood Hazard Area (SFHA). . . ." The Limits of Liability section further defines "Special Flood Hazard Area (SFHA)" as "The areas of a Flood Insurance Rate Map (FIRM) identified as Zone(s): A . . . AE. . . ."

It is undisputed that the Mall was "partially or totally situated" in an area which at the time of loss had been identified as AE on a Flood Insurance Rate Map; therefore, the Mall was in a **High Hazard Flood Zone**. Because it was in an area designated as a **High Hazard Flood Zone** at the time of the loss, the Limits of Liability for losses caused by flood at the Mall were $50,000,000, not $200,000,000 million.

The foregoing notwithstanding, Plaintiffs contend the limits of liability were $200,000,000 because the term "location," when it appears in the Policy in quotation marks, must be given the same meaning as the defined term **High Hazard Flood Locations**. More specifically, Plaintiffs insist that we should equate "location" with **High Hazard Flood Locations** so that, for example, Endorsement 6, which reads, "[a]ll property, at a 'location'" would be interpreted as meaning "[a]ll property, at a **HIGH HAZARD FLOOD LOCATION**." We disagree.

The Policy provides an expressed and specific definition for the term **High Hazard Flood Locations** which always appears in the Policy in bold font and upper case

- 11 -

letters. The single word "location," when it appears in quotation marks, is never in bold font or upper case letters. Moreover, the Policy does not state that words which merely appear in quotation marks shall be considered defined terms. Even more significant is the fact there is no definition for the term "location" in the Policy.

Simply stated, we find no basis in law or fact to equate the undefined term "location" with the defined term **High Hazard Flood Locations**. There is no reason to conclude that the drafters of the Policy intended for the term "location" and **High Hazard Flood Locations** to be synonymous. Therefore, we are unable to conclude that they are.

Plaintiffs also contend that our interpretation creates an ambiguity and renders the term "location" meaningless, which is contrary to Indiana precedent. *See American Family Life Assur. Co.*, 700 N.E.2d at 1177 (Courts are to "make all attempts to construe the language in a contract so as not to render any words, phrases, or terms ineffective or meaningless.") Specifically, Plaintiffs assert that "location" becomes meaningless because, under our interpretation, the phrase "property at a 'location'" would have the same meaning without the words "at a 'location.'" Once again, we respectfully disagree.

Our interpretation does not render either term ambiguous or meaningless. Both "location" and "property" retain significance and purpose. While both terms are used throughout the Policy, neither term is defined in the Policy. From a review of the entire Policy, we have determined that "location" identifies where Simon's property is located, or to be found, while "property" identifies what is to be found at that location.[11] That is, there may be multiple properties at one location. We see no basis in law or fact to give these terms other or additional meanings.

To explain the distinction between "location" and "property," we turn to Endorsement 12, Key Tenant Incentive Insurance, in the Policy which states:

> If any tenant has been paid an incentive by the Insured to locate its operations at an Insured *Location* and if, as a result of insured loss or damage to *property* of the type insured, that tenant cancels its lease pursuant to the lease agreement or by operation of law, the unamortized amount of the incentive to the extent not paid as improvements or betterments shall be recoverable by the insured.

---

[11] This distinction can be seen in the Policy's definition of "Attraction Properties" which states "Attraction Properties [are] [p]roperties not owned or operated by the Insured, which attract potential customers to the vicinity of the Insured's location." Here, location is used to describe the entire area which encompasses Simon's property at that location.

(emphasis added).[12] As stated above, the Policy uses "location" as a broad term that encompasses what is to be found at that location. (i.e., Simon's property). Specifically here, location means the site or vicinity where Simon's property may be found while property is used to describe what is insured at that site (i.e., property at that location).

Another illustration is contained within Endorsement 12, Supplemental Contingent Rental Insurance, which reads:

> The Rental Insurance coverage is extended to cover the Actual Loss Sustained by the Insured consisting of the consequential reduction of rental income of the Insured which is solely the result of physical loss or damage of the type insured against to *property* of the type insured situate[sic] within two (2) miles of an Insured *Location.*

(emphasis added). The terms "location" and "property" still retain their same characteristics. "Location" is used as a broad term to include the physical site or vicinity where Simon's property is located while the term "property" identifies what is to be found at that location. Furthermore, the property is what is insured at that location.

Therefore, when we apply this understanding to the endorsement at issue, the parties' intent is clear. **High Hazard Flood Zones** and **High Hazard Flood Locations** are defined terms that apply only when used within the Policy. Both terms are only used once within the Policy: **High Hazard Flood Zones** in the Limits of Liability section and **High Hazard Flood Locations** in the Deductible section. Therefore, if Opry Mills meets the criteria of High Hazard Flood Zones, the $50 million limitation applies.

The term **High Hazard Flood Zones** is defined as:

> [A]ll property at a "location" that is partially or totally situated in an area which at the time of loss or damage has been designated on a Flood Insurance Rate Map (FIRM) to be a Special Flood Hazard Area (SFHA) . . .

> Special Flood Hazard Area (SFHA):

> The areas of a Flood Insurance Rate Map (FIRM) identified as Zone(s): A, AO, AH, A1-A30, AE, A99, AR, AR/A, AR/AE, AR/A1-A30, AR/AH, AR/AO, V, V1-V30, VE or VO.

---

[12] While "Insured Location" is capitalized, it is not a defined term within the Policy.

- 13 -

Here, "location" and "property" retain their same meanings as discussed above. "Location" refers to the physical site or vicinity and "property" refers to what is to be found at that physical site or vicinity.

Based on the foregoing reasoning, we shall now determine whether the "property" or the "location" must be situated within a SFHA. This turns on the Policy's use of the word "that" immediately preceding "location." In deciding which word "that" modifies, we look to the last-antecedent rule. As the Indiana Supreme court so succinctly explained,

> The "last antecedent rule" is a textual principle stating "that where one phrase of a statute modifies another, the modifying phrase applies only to the phrase immediately preceding it," unless there is a comma between the modifier and the preceding phrase. *Wandrey*, 334 B.R. at 430–31 (quoting *O'Kane v. Apfel*, 224 F.3d 686, 690 (7th Cir.2000) and 73 Am.Jur.2d Statutes §§ 137–39 (2005)). See also *City of Ft. Wayne v. Consol. Elec. Distribs., Inc.*, 998 N.E.2d 733, 737 (Ind.Ct.App.2013) (quoting *FLM, LLC v. Cincinnati Ins. Co.*, 973 N.E.2d 1167, 1176 (Ind.Ct.App.2012) ("the descriptive words in a phrase should, in the absence of punctuation, be referred to their nearest antecedent")), *trans. denied*.

*In re Howell*, 27 N.E.3d 723, 727 (Ind. 2015).

While the *Howell* court applied this rule to interpret a statute, the principle holds true in this case. Since there is no comma between the modifier and the preceding phrase, "that" modifies "location." Therefore, if the Opry Mills location is partially situated in a SFHA it is subject to the $50 million sublimit. On the FIRM, a part of the Opry Mills location is situated within a SFHA (specifically, Zone AE). This is undisputed within the record. Therefore, the $50 million limit applies to Opry Mills.

To briefly conclude, this court finds no ambiguity in the Policy provisions at issue. In applying Indiana law, we have determined that the plain meaning of the Policy calls for us to determine whether Opry Mills fits within the definition of **High Hazard Flood Zones** and not **High Hazard Flood Locations**. Since Opry Mills is partially located within one of the zones listed under **High Hazard Flood Zones**, the $50 million sublimit applies.

## II. ESTOPPEL CLAIM

Plaintiffs also contend the trial court erred in granting summary judgment in favor of Defendants on Plaintiffs' estoppel claim. Conversely, Defendants contend the trial court properly dismissed Plaintiffs' estoppel claim because, *inter alia*, Plaintiffs failed to

- 14 -

establish an essential element of an estoppel claim, that either of them reasonably relied on the promise to their detriment.[13]

Plaintiffs asserted an alternative estoppel claim alleging that, if the trial court found that the Policy provided only $50 million in flood coverage, Defendants were estopped from denying the Policy provided $200 million of flood coverage based on the multiple Certificates of Insurance ("Certificates") Defendants authorized Aon Risk Services Central, Inc. ("Aon") to issue in 2008-2010.[14] Plaintiffs rely on the fact the Certificates Aon issued represented that $200 million in flood coverage was available for the Mall. More specifically, Plaintiffs rely on the fact that three months before the flood,

> [a Certificate] issued on behalf of Appellants ("Insurers") stated that the Mall had $200 million in flood coverage under the 2010 insurance policies at issue ("Policies"). Over the three years before the flood, six such . . . Certificates were issued, all stating the Mall had $200 million in flood coverage. The other documents created at the time the Policies were issued, and for years before that, said the same thing.

> . . .

> [Also] [i]n 2010, [a secured lender] reviewed the . . . Certificate for that policy year and concluded that there was no need for further action because the . . . Certificate showed proof of adequate insurance. If the certification had shown a reduction in the amount of flood coverage from the preceding year, that would have raised a "red flag" and [the secured lender] would have made inquiries about why the coverage was reduced. This, in turn, would have brought the issue to Opry Mills' attention, providing it with an opportunity to address any issues regarding the flood limits applicable to the Mall before a loss occurred.

---

[13] Defendants also contend the trial court correctly ruled on the estoppel issue because, *inter alia*, Aon, which was solely responsible for issuing the Certificates, was Simon's agent, Defendants "played no role in the creation or issuance of the [C]ertificates," and Aon never sent Defendants copies of the certificates once they were issued. However, we find it unnecessary to address the issue of Aon's potential agency relationship.

[14] Plaintiffs asserted claims against Aon in this action but Aon is not party to this appeal. Aon is a global provider of insurance related services. Aon was hired by Simon to facilitate the issuance of Simon's one billion dollar property insurance policy. Defendants contend that Aon was acting on behalf of Simon at all material times. Plaintiffs contend Aon acted as an agent on behalf of Defendants at all material times including the issuance of the Policy and in the issuance of the Certificates that pertain to the estoppel claim. Because the estoppel claim can be resolved based on the lack of reliance, we have determined it is not necessary to determine the disputed agency issues as they pertain to Aon.

(Internal citations to the record omitted). The secured lender referenced immediately above is Landesbank Hessen-Thuringen Girozentrale, a commercial bank based in Germany that is commonly referred to as "Helaba," which has a substantial secured interest in the Mall.[15]

What Plaintiffs are contending is that they relied on Defendants to issue proper Certificates to its secured lender, Helaba, that Defendants failed to do so, and Plaintiffs relied on this to their detriment because if the Certificates had been properly issued, Helaba would have notified Plaintiffs of the lower coverage amount.[16] The trial court was not persuaded by this argument and neither are we because Plaintiffs' reliance theory is too far attenuated.

Pursuant to Indiana law, estoppel "refers to a preclusion from asserting rights by an insurance company or an abatement of rights and privileges of the insurance company where it would be inequitable to permit the assertion." *Employers Ins. of Wausau v. Recticel Foam Corp.*, 716 N.E.2d 1015, 1028 (Ind. Ct. App. 1999)(quoting 46 C.J.S. *Insurance* § 786 (1993)) (footnotes omitted). Like Tennessee, Indiana law recognizes an element of equitable estoppel as "the misleading of a party entitled to rely on the acts or statements in question and a consequent change of position to his detriment." *Id.* (quoting *United Services Auto. Ass'n v. Caplin*, 656 N.E.2d 1159, 1163 (Ind. Ct. App. 1995)); *see Barnes & Robinson Co., Inc. v. OneSource Facility Servs., Inc.*, 195 S.W.3d 637, 645 (Tenn. Ct. App. 2006) ("An important component of the doctrine of promissory estoppel is 'detrimental reliance' because the plaintiff must show not only that a promise was made, but also that the plaintiff reasonably relied on the promise to his detriment.")

In its order granting summary judgment to Defendants on this issue, the trial court concluded that neither Opry Mills nor Simon "recall seeing the [Certificates] before the May 2, 2010 flood and the record establishes that Opry Mills and Simon did not do anything or refrain from doing anything, in reliance on the [Certificates] that would support a claim against [Defendants]." We agree and find, as the trial court did, that this material fact is not in dispute and summary judgment was proper.

Having closely examined Plaintiffs' claim of reliance on the Certificates, we note that the only entity that may have relied on the Certificates was Helaba. However, and

---

[15] Helaba issued a loan to Opry Mills in 2007 in the principal amount of $280 million. The loan is secured by real and personal property and other assets of Opry Mills. Helaba asserted a separate claim based on the fact that it "is a loss payee under the insurance policies at issue in this lawsuit and has certain rights with respect to the proceeds of those policies." However, Helaba is not a party to this appeal.

[16] That is, the Certificates should have stated there was $50 million in coverage and not $200 million. Thus, Helaba would have raised concerns with Plaintiffs about the lower insurance level because the loan issued in 2007 required Plaintiffs to maintain $200 million in insurance.

significantly, Helaba is not a party to this appeal. Moreover, the trial court expressly found that Helaba did not rely on the Certificates when it granted judgment to the Excess Insurers on Helaba's separate estoppel claim.

We agree with the trial court's conclusion that there is no evidence to support a finding that Plaintiffs relied on the Certificates to their detriment. Accordingly, we affirm the grant of summary judgment in favor of Defendants on Plaintiffs' claim of estoppel.

## IN CONCLUSION

The judgment of the trial court is reversed, and this matter is remanded with costs of appeal assessed against Plaintiffs.

FRANK G. CLEMENT JR., P.J., M.S.

- 17 -